GRABENDIKE *v.* ADIX.

1. JOINT ADVENTURES—DEFINITION.
   A joint adventure contemplates an enterprise jointly undertaken.

2. SAME—PROFIT.
   A joint adventure is an association of joint undertakers to carry out a single project for profit.

3. SAME—SHARING OF PROFITS AND LOSSES.
   Profits and losses of a joint adventure are to be shared by the joint adventurers, though the liability of a joint adventurer for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract.

4. SAME—CONTRIBUTIONS—COMMUNITY OF INTERESTS AND CONTROL.
   There must be a contribution by the parties to a common undertaking to constitute a joint adventure and a community of interest as well as some control over the subject matter or property right of contract.

5. LICENSES—JOINT ADVENTURES—OIL WELL.
   The provisions of the blue sky law are not applicable to action of

REFERENCES FOR POINTS IN HEADNOTES
[1, 2] 30 Am Jur, Joint Adventures § 3.
[3] 30 Am Jur, Joint Adventures § 32.
[4] 30 Am Jur, Joint Adventures § 10.
[6] 12 Am Jur, Contracts § 447.
[7] 12 Am Jur, Contracts § 451.
[8] 19 Am Jur, Equity § 463.

defendants in selling an interest in joint venture agreement relative to drilling an oil well to 10 plaintiffs (CL 1948, § 451.105[j]).

6. CONTRACTS—RESCISSION—TIME.

One who desires to rescind a contract must act within a reasonable time and what is a reasonable time depends upon the circumstances of each particular case.

7. SAME—RESCISSION—RESTORATION OF OPPOSITE PARTY TO STATUS QUO.

The party seeking cancellation or rescission of a contract must restore the opposite party to status quo.

8. EQUITY—MAXIMS.

He who seeks equity must do equity.

9. CONTRACTS — OIL WELLS — RESCISSION — TIME — RESTORATION TO STATUS QUO.

Plaintiffs who waited approximately 6 months before attempting to rescind purchase of interest in joint venture in drilling an oil well and until after the first well turned out to be a dry hole, at which time the speculative value of the leases involved was greatly depreciated, were not entitled to rescind, since they were then unable to restore to defendant the leases with the same value as when they received them.

Appeal from Wayne; Brennan (John V.), J. Submitted June 11, 1952. (Docket No. 40, Calendar No. 45,482.) Decided December 9, 1952.

Action by William B. Grabendike and others against Robert H. Adix to recover damages upon rescission of sale of interest in oil lease. Case dismissed on motion. Plaintiffs appeal. Affirmed.

*Maile, Leach & Bihary* (*Marvin W. Reider,* of counsel), for plaintiffs.

*Fixel & Fixel,* for defendant.

SHARPE, J. On September 21, 1948, the Roosevelt Oil Company and Merrill Drilling Company entered into an agreement for the drilling of one or more oil

wells in Isabella county, Michigan. A copy of the agreement reads as follows:

"September 21, 1948
"Merrill Drilling Company
Mount Pleasant
Michigan
        "In re: Additional oil and gas leasehold
        acreage in the vicinity of Sheahan #1 well
        in the southeast 1/4 of the southwest 1/4 of
        the southwest 1/4 of section 7, township 15
        north, range 4 west, Isabella township, Isa-
        bella county, Michigan.

*"Gentlemen:*
        "This will evidence the understanding reached be-
tween Roosevelt Oil Company, hereinafter referred
to as 'Roosevelt,' and Merrill Drilling Company,
hereinafter referred to as 'Merrill,' with reference
to the acquisition and ownership of additional oil
and gas leasehold acreage in the vicinity of the above
well, which well is now in process of being drilled by
Merrill. It is understood that Merrill's original
drilling block acreage is not affected by the provi-
sions hereof.
        "(1) It being understood that Merrill, pursuant
to the oral understanding between the parties hereto,
has been acquiring additional leases in said area and
is continuing its efforts to acquire as much acreage
as possible, Merrill agrees to continue its efforts to
acquire leases on all open acreage in the general area
of said well.
        "(2) The cost of acquiring all of said acreage shall
be borne by Roosevelt and to this end Roosevelt has
already advanced to Merrill the sum of $2,000. It is
the contemplation of the parties that the total cost
of acquisition will not exceed $3,000.
        "(3) Upon completion of such leasing operations,
a plat shall be attached hereto showing all of the
acreage so acquired, and at said time Merrill shall
assign to Roosevelt by good and sufficient assign-

ment, in form proper for recording purposes, all of its interest in the leases so acquired.

"(4) In consideration of Merrill's services in acquiring such acreage, Merrill shall be entitled to an undivided 1/4 interest in such leases, subject to the following provisions:

"(a) In event said Sheahan #1 well is saved as a commercial producer of oil and/or gas, Merrill's undivided 1/4 of the working interest shall be deemed to be upon a carried basis—that is to say, Roosevelt shall pay all costs of acquiring, developing, equipping and operating said leases and the rentals falling due thereon without expense of any kind to Merrill. Roosevelt shall be entitled to receive all proceeds accruing to the sale of leasehold production until such time as it shall have been repaid for all of said expenses, and thereupon Merrill shall be deemed the owner of a 1/4 working interest which shall entitle Merrill to 1/4 of the proceeds from the sale of the leasehold production and 1/4 interest in all material and equipment acquired for use on such leases, with Merrill to pay out of his share of the production his proportionate part of the operating expenses as well as his proportionate part of the cost of drilling and equipping any wells that may be drilled thereafter. At the option of Roosevelt, Roosevelt may bill the pipe line purchaser for Merrill's share of such costs and such pipe line purchaser shall deduct said amounts from Merrill's share before making payment to Merrill.

"(b) In the event said Sheahan #1 is not saved as a commercial producer, Merrill shall be the owner of an undivided 1/4 of the working interest in the leases so acquired, free of any of the acquisition costs, but same shall not be deemed a carried interest. Each party shall pay its proportionate part of all rental, development, equipping and operating charges.

"(c) The full right of supervision of all wells that may be drilled on said leases is hereby granted to Roosevelt, and Roosevelt is likewise granted a call

on all production from the property on the basis of the regularly posted field price.

"(d) For the convenience purposes, Roosevelt will pay when due the delay rentals on said leases, but either party may relieve itself of any rental obligation by offering to assign to the other party its interest in any acreage which it desires to drop, provided such offer of assignment is made on or before 30 days prior to the next rental due date on the affected acreage.

"If our mutual understanding is correctly set forth herein, kindly acknowledge your acceptance at the place indicated on the inclosed copy, return same to us, and same will constitute a binding memorandum of agreement between us.

"Yours very truly,
ROOSEVELT OIL COMPANY
By G. E. Hatch

"ACCEPTED—
this 21st day of September, 1948
MERRILL DRILLING COMPANY
By Stuart A. Merrill"

Some time prior to March 7, 1949, defendant, Robert H. Adix, purchased a 2/64th interest in the project from Merrill Drilling Company, and such purchase was acceptable to Roosevelt Oil Company. On March 7, 1949, defendant, Robert H. Adix, sold to plaintiffs a 1/64th interest in the project for the sum of $10,000. The agreement for such sale reads as follows:

"AGREEMENT

"THIS AGREEMENT, Made and entered into this 7th day of March, 1949, by and between Robert H. Adix of Detroit, Wayne county, Michigan, party of the first part, hereinafter called 'First Party,' and the various second parties as signers hereto of the various addresses, party of the second part, hereinafter called 'Second Party.'

"WITNESSETH THAT: .

"WHEREAS, First party is the owner of working interest in certain oil leases, covering and affecting lands, in township 15 north, range 4 west, same being Isabella township, Isabella county, Michigan, more specifically shown on plat hereto attached and labeled 'Exhibit A,' and second party is desirous of acquiring an interest therein.

"(1) Now THEREFORE, for and in consideration of the sum of $1 this day paid by second party to first party, receipt of which is hereby acknowledged, first party hereby agrees to assign to second party, without warranty of title, an undivided 1/64th working interest, in the lands or parcels of acreage according to Exhibit 'A', with assignment in form, proper for recording purposes, to be executed and delivered upon completion, as commercial producing oil wells, as and when said well and wells are completed.

"(2) It being understood that aforesaid payment shall assure said second party of a paid up working interest on a carried basis, that is to say, that the Roosevelt Oil Company designated operator of said lease, shall pay all cost of, developing, equipping and operating said leases and the rentals falling due thereon without expense of any kind to second party and according to copy of letter to Merrill Drilling Company and hereto attached and made a part hereof.

"(3) Roosevelt Oil Company shall be entitled to receive all proceeds accruing to the sale of leasehold production until such time as it shall have been repaid for all of said expenses, and thereupon second party shall be deemed the owner of a 1/64th working interest which shall entitle second party to 1/64th of the proceeds from the sale of the leasehold production and 1/64th interest in all material and equipment acquired for use on such leases, with second party to pay out of his share of the production his proportionate part of the operating expenses as well as his proportionate part of the cost of

drilling and equipping any wells that may be drilled thereafter. At the option of Roosevelt Oil Company, Roosevelt Oil Company may bill the pipe line purchaser for second party's share of such costs and such pipe line purchaser shall deduct said amounts from second party's share before making payment to second party.

"(4) The full right of supervision of all wells that may be drilled on said leases is hereby granted to Roosevelt Oil Company, and Roosevelt Oil Company is likewise granted a call on all production from the property on the basis of the regularly posted field price.

"(5) For the convenience purposes, Roosevelt Oil Company will pay when due the delay rentals on said leases, but either party may relieve itself of any rental obligation by offering to assign to the other party its interest in any acreage which it desires to drop, provided such offer of assignment is made on or before 30 days prior to the next rental due date on the affected acreage.

"IN WITNESS WHEREOF, The parties hereto have signed and sealed this agreement as of the day and year first above written.

"ROBERT H. ADIX<br>First Party

"WITNESS:
 GEORGE W. GIBSON
 ROBERT E. FEYS
     "Second Party
 "1. Wm. B. Grabendike, 15500 Robson, Detroit 27;
 2. Helen V. Grabendike;
 3. F. A. DeBoos, 715 Monroe blvd., Dearborn, Mich.;
 4. Mrs. F. A. DeBoos, 715 Monroe blvd., Dearborn, Mich.;
 5. Warren J. Beauchamp, 14317 Rutherford ave., Detroit 27;
 6. V. F. Gilmore, 23655 Northwestern hwy., Detroit 19;
 7. James L. Valiquett, 8410 W. McNichols rd.;

8. W. E. Powers, 807 Chestnut st., Birmingham;
9. William L. Neth, 11754 Griggs, Detroit 4;
10. Clinton C. Carpenter, 1540 Beaufield, Ferndale 20.''

On May 6, 1951, plaintiffs brought an action in the circuit court of Wayne county to rescind the agreement. On August 28, 1951, plaintiffs filed an amended declaration in which count 1 contains the following:

''That said solicitations, offer and sale were void and unlawful and in violation of the provisions of the statute of the State of Michigan commonly known as the 'blue sky law,' and particularly in violation of section 3, unlawful sales;[1] section 16, civil liability for false statements;[2] section 20, unlawful sales, civil liability of seller;[3] section 21, license of dealer or salesman;[4] and section 5.[5] Plaintiffs further allege that the defendant herein made such solicitations, offer and sale in the course of continued and successive transactions of a similar nature and like character, all contrary to the laws of the State of Michigan, and particularly in violation of the 'blue sky law,' as hereinabove mentioned. That the sale of such interest had not been approved, accepted or validated by the Michigan securities commission as required by the hereinabove-mentioned statute at the time the said solicitations, offer and sale were made; further that the defendant herein failed to obtain a dealer or salesman's license in accordance with the above-mentioned statutes and that the defendant herein made untrue statements concerning the sale of said interest to the plaintiffs herein.''

[1] CL 1948, § 451.103 (Stat Ann § 19.743).—REPORTER.
[2] CL 1948, § 451.116 (Stat Ann 1951 Cum Supp § 19.756).—REPORTER.
[3] CL 1948, § 451.120 (Stat Ann § 19.760).—REPORTER.
[4] CL 1948, § 451.121 (Stat Ann 1951 Cum Supp § 19.761).—REPORTER.
[5] CL 1948, § 451.105 (Stat Ann 1951 Cum Supp § 19.745).—REPORTER.

Count 2 of the amended declaration contains the following:

"That to induce plaintiffs to purchase said 1/64th working interest, the said defendant represented to the plaintiffs herein that the Standard Oil Company was going to buy and had already offered to buy the 2,660 acres of land for the sum of $1,000,000, the defendant well knowing at the time that such statement was false, fraudulent and misleading.

"That the said defendant, with intent to cheat and defraud these plaintiffs and to induce these plaintiffs to purchase this working interest, stated to these plaintiffs on numerous occasions that the approximate number of wells to be dug within the first year of operation would be 35 wells, but not withstanding such false, fraudulent and misleading representations, the said defendant did induce and solicit these plaintiffs to buy such working interest, well knowing prior to the sale of such working interest to the plaintiffs that the land had already been tested and had been proven as a nonproducer. That at the time said sale was consummated, your plaintiffs did not have any knowledge whatsoever of the earlier experiments testing the productivity of such land."

And count 3 contains the following:

"That the said defendant herein, to-wit, on the 7th day of March, 1949, was indebted to the plaintiffs in the sum of $10,000 for the price and value of goods then and there sold and delivered by the plaintiffs to the defendant at his request."

Defendant filed a motion to dismiss plaintiffs' declaration because count 1 of plaintiffs' declaration is based upon an alleged violation of PA 1923, No 220,[1] known as the blue sky act, wherein such act is not applicable to parties engaged in a joint ven-

---

[1] CL 1948, § 451.101 *et seq.* (Stat Ann and Stat Ann 1951 Cum Supp § 19.741 *et seq.*).—REPORTER.

ture; because the charges of fraud and misrepresentation are matters of opinion and not a representation of an existing fact, and "because said alleged cause of action is based on a joint claim of plaintiffs as a unit, and Clinton C. Carpenter, one of the plaintiffs, says that he has no claim against defendant, that no representations were made to him or any agent representing him, and that if there were any claim that he is not interested in maintaining a suit against defendant on any such claim, and releases same, by reason thereof, plaintiffs' suit should be dismissed."

It also appears that since the beginning of the present action plaintiff, Clinton C. Carpenter, addressed a letter to his coplaintiffs as follows:

June 12, 1951

"To:
  William B. Grabendike
  Helen V. Grabendike
  F. A. DeBoos
  Mrs. F. A. DeBoos
  Warren J. Beauchamp
  V. F. Gilmore
  James L. Valiquett
  Walter E. Powers
  William L. Neth
  Saul Leach
"*Gentlemen and Mesdames:*
  "Re: Legal Action of Oil Transaction between the above named persons and Robert H. Adix.

"This is to advise you that I do not wish to join with you in any further legal action against said Robert H. Adix concerning the oil transaction with him as the party who was interested in this matter with me does not care to be involved in any legal or court proceedings or claims.

"Accordingly, I am hereby withdrawing as a party to any further action or claim in this transaction.

"Yours very truly,
(sgd) CLINTON C. CARPENTER
Clinton C. Carpenter
1540 Beaufield
Ferndale 20, Michigan"
"CCC:mjh"

The cause was submitted to the court on defendant's motion to dismiss. No testimony was taken. The court granted defendant's motion to dismiss, and in an opinion stated:

"This cause came on for hearing on the motion of the defendant to dismiss. Arguments were had on said motion and briefs were filed by the respective parties.

"The court being of the opinion that defendant's motion to dismiss is well grounded and should be granted,

"IT IS HEREBY ORDERED that the above entitled suit be and hereby is dismissed and that defendant have his costs to be taxed."

It also appears that subsequent to the filing of the claim of appeal in the Supreme Court, plaintiffs filed a motion to drop Clinton C. Carpenter as a party plaintiff. On May 13, 1952, we denied the motion without prejudice.

Plaintiffs appeal and urge that the transaction of the parties was not a joint venture, and that defendant is subject to the blue sky law, CL 1948, § 451.101 et seq. (Stat Ann and Stat Ann 1951 Cum Supp § 19.741 et seq.).

In determining this issue we have in mind that plaintiffs purchased a working interest in a business enterprise which was subject to the written contract between the Roosevelt Oil Company and Merrill Drilling Company. The so-called blue sky law provides that "The sale of certificates or other evidences

of participation in a joint adventure" are exempt from the provisions of the act. CL 1948, § 451.105 (j) (Stat Ann 1951 Cum Supp § 19.745) defines a joint venture as follows:

"For the purpose of this section a joint adventure shall be construed as a voluntary association of not more than 25 individuals who shall agree to be joined together for the purpose of carrying out the plan or project for which the association has been organized."

In *Hathaway* v. *Porter Royalty Pool, Inc.,* 296 Mich 90, 102 (138 ALR 955), we said:

"It can be said that a joint adventure contemplates an enterprise jointly undertaken; that it is an association of such joint undertakers to carry out a single project for profit; that the profits are to be shared, as well as the losses, though the liability of a joint adventurer for a proportionate part of the losses or expenditures of the joint enterprise may be affected by the terms of the contract. See 17 Ann Cas 1022, 1025; 24 Ann Cas 202, 203, and 39 Ann Cas 1210, 1214. There must be a contribution by the parties to a common undertaking to constitute a joint adventure (see annotation, 63 ALR 909, 910); and a community of interest as well as some control over the subject matter or property right of contract. *Griffiths* v. *Von Herberg,* 99 Wash 235 (169 P 587); *Darling* v. *Buddy,* 318 Mo 784 (1 SW2d 163, 58 ALR 493)."

In the case at bar the agreement between Roosevelt Oil Company and Merrill Drilling Company provided for a joint agreement to drill an oil well. Each of the parties made a contribution, and were to have an agreed interest in the assets; each reserved a certain amount of control, and each of the parties were to share in the profits and losses. In our opinion the agreement between Roosevelt Oil Company and Merrill Drilling Company was clearly a

joint venture. In view of the fact that plaintiff's share in the enterprise was subject to the terms of the contract between Roosevelt Oil Company and Merrill Drilling Company, we hold that plaintiffs were, by virtue of said contract, engaged in a joint venture. It follows that the provisions of the blue sky law are not applicable to the action of defendant in selling an interest in the enterprise to plaintiffs.

Defendant urges that plaintiffs are barred from rescinding because they waited 6 months, and until after the first test well turned out to be a "dry well." It is a general rule that one who desires to rescind a contract must act within a reasonable time; see *Dennis* v. *Jones*, 44 NJ Eq 513 (14 A 913, 6 Am St Rep 899), and what is a reasonable time depends upon the circumstances of each particular case. It is also the rule that the party seeking cancellation or rescission must restore the opposite party to status quo.

In 9 Am Jur, p 384, it is said:

"Sec. 39. Restoration of defendant to status quo. —Under the maxim of equity that he who seeks equity must do equity, the plaintiff in an action to cancel or rescind an instrument must generally, as a condition of obtaining such relief, restore the defendant to the position which he occupied before the transaction in question. The plaintiff is generally required to restore, or offer to restore, the benefits he has received, not as a condition of acquiring the right to sue, but because of the equitable maxim that he who seeks equity must do equity. Certainly the plaintiff will not be allowed to derive any unconscionable advantage from the cancellation, and usually he will be denied relief when it is not possible substantially to restore the defendant to the status quo. The mere inability of the plaintiff to make restoration does not relieve him of his obligation to do so, or permit the court to grant him relief. Thus, a vendor of land who sues in equity

to rescind a conveyance or cancel a recorded contract to convey will be required to restore the consideration received by him. In the case of a grantor suing to set aside or cancel a deed given in consideration of an agreement of support, on the ground of the grantee's death, an accounting of the amount expended for his support must be rendered, and the amount by which such sum exceeds the value of the use of the premises repaid.

"The general rule requiring the restoration of the defendant to the status quo is applicable in a suit by the United States to secure the cancellation of a conveyance or the rescission of a contract, although the rule will not be applied to frustrate the purpose of its laws or to thwart public policy."

In 12 CJS, p 1005, it is said:

"Where the circumstances of the case are such that the parties cannot be placed in substantially the same situations they occupied when the contract was made, as a general rule a court of equity will not rescind the contract, or at least it will grant relief only where the clearest and strongest equity imperatively demands it."

See, also, *Heth* v. *Oxendale,* 238 Mich 236.

In *Smith* v. *Detroit & D. Gold Mining Co.,* 17 SD 413 (97 NW 17), it was held that a contract cannot be rescinded after the selling price of the property was greatly depreciated by demonstrating its unproductiveness for gold mining.

In *Twin-Lick Oil Co.* v. *Marberry,* 91 US 587, 592, 593 (23 L ed 328), the court said:

"No delay for the purpose of enabling the defrauded party to speculate upon the chances which the future may give him of deciding profitably to himself whether he will abide by his bargain, or rescind it, is allowed in a court of equity.   *   *   *

"The fluctuating character and value of this class of property is remarkably illustrated in the history

of the production of mineral oil from wells. Property worth thousands today is worth nothing tomorrow. * * * The injustice, therefore, is obvious, of permitting one holding the right to assert an ownership in such property to voluntarily await the event, and then decide when the danger which is over has been at the risk of another, to come in and share the profit. * * *

"The class of property here considered, subject to the most rapid, frequent and violent fluctuations in value of anything known as property, requires prompt action in all who hold an option, whether they will share its risks, or stand clear of them."

In the case at bar plaintiffs waited approximately 6 months while the property was being tested for oil, and when the first oil well turned out to be a dry hole, they attempted to rescind. Plaintiffs could not restore to defendant the leases with the same value as when they received them. As a result of the drilling of a dry hole, the speculative value of the leases was greatly depreciated.

Under such circumstances plaintiffs are not entitled to rescission. The judgment is affirmed, with costs to defendant.

DETHMERS, CARR, BUSHNELL, and BOYLES, JJ., concurred with SHARPE, J.

BUTZEL and REID, JJ., concurred in the result.

The late Chief Justice NORTH did not sit.