TRI–STATE RUBBER & EQUIPMENT, INC., General Investment Corp., Tandem Transportation Corp., Arrow Leasing Corp., Arrow Transportation Co., Transport Investment Corp., and Tri–State Equipment, Inc., Plaintiffs and Counter–Defendants,

v.

CENTRAL STATES SOUTHEAST & SOUTHWEST AREAS PENSION FUND, an employee benefit plan, and Howard McDougall, Trustee, Defendants and Counter–Plaintiffs,

Civ. A. No. 86–70091.

United States District Court, E.D. Michigan, S.D.

Dec. 9, 1987.

A.T. Lippert, Jr., Smith & Brooker, P.C., Saginaw, Mich., for plaintiffs and counter-defendants.

Douglas A. Firth, Russell N. Luplow, P.C., Bloomfield Hills, Mich., for defendants and counter-plaintiffs.

## MEMORANDUM OPINION AND ORDER

FEIKENS, District Judge.

### I. *Background*

Plaintiffs, counter-defendants, are seven corporations owned or controlled by Walter G. Bay ("Bay"). Defendants, counter-plaintiffs, are a multiemployer pension fund, as defined by 29 U.S.C. § 1301(a)(3),[1] and its trustee.

Defendants have assessed a $786,439.57 withdrawal liability[2] against Saint Louis Freight Lines, Inc. ("St. Louis"), a non-party, pursuant to 29 U.S.C. §§ 1381–1405. Plaintiffs seek a declaratory judgment that they are not liable for the $786,439.57 assessed against them by defendants. Defendants counterclaim for a judgment declaring plaintiffs liable for St. Louis' withdrawal. I have jurisdiction pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 1451(c).

I denied defendants' motions to dismiss and to compel interim payments and ordered a bench trial on one issue: "whether plaintiffs and Saint Louis constitute a 'single employer.'" *Tri–State Rubber & Equipment, Inc. v. Central States Southeast & Southwest Areas Pension Fund,* No. 86–70091, mem. op. and order at 3 (E.D.Mich. Nov. 6, 1986) [Available on WESTLAW, 1986 WL15680]. Specifically, the issue is whether Walter Bay owned St. Louis at the time St. Louis withdrew from the Fund.[3]

---

1. This provision is part of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA").

2. "Withdrawal liability" refers to a contributing employer's share of the unfunded vested benefit liability in a multiemployer pension plan at the time the employer's obligation to contribute ceases. 29 U.S.C. §§ 1381(b), 1382, and 1391(b)–(d).

3. ERISA imposes withdrawal liability, pursuant to 29 U.S.C. § 1382, on an "employer" who "(1) permanently ceases to have an obligation to contribute under the plan, or (2) permanently ceases all covered operations under the plan." 29 U.S.C. § 1383(a). Under regulations prescribed by the Pension Benefit Guaranty Corporation ("PBGC"), coextensive with regulations prescribed by the Secretary of the Treasury under 26 U.S.C. § 414(c), "businesses under common control" are treated as being a "single employer" for purposes of determining ERISA withdrawal liability. 29 U.S.C. § 1301(b)(1) (West Supp.1987).

In 29 C.F.R. § 2612.2 (1987), the PBGC incorporates the Treasury Department's regulations promulgated under the Internal Revenue Code. 26 U.S.C. § 414(c). Within the definition of "businesses under common control" are "broth-er-sister groups" of businesses. 26 C.F.R. § 11.414(c)–2(a). A "brother-sister group" exists when "the same five or fewer persons ... own ... [1] a controlling interest of each organization, and ... [2] such persons are in effective control of each organization. 26 C.F.R. § 11.414(c)–2(c). "Controlling interest" means ownership of stock representing at least eighty percent (80%) of the total stock value or at least eighty percent (80%) of the total voting power considering all classes of stock. 26 C.F.R. § 11.414(c)–2(b)(2)(i)(A). "Effective control" means ownership of stock representing at least fifty percent (50%) of the total stock value or at least fifty percent (50%) of the total voting power. 26 C.F.R. § 11.414(c)–2(c)(2)(i). Such "effective control" ownership is the sum of the "ownership of each ... [individual] only to the extent such ownership is identical with respect to each ... organization [in the brother-sister group]." 26 C.F.R. § 11.414(c)–2(c).

This litigation presents a less complicated scenario. Bay owned at least eighty percent (80%) of each plaintiff corporation. The question here is whether Bay owned twenty-five percent (25%) of St. Louis on the withdrawal date (in which case Bay and the Davises did not have "effective control" of all the corporations and plaintiffs were not a single employer with St. Louis) or one hundred percent (100%) (in which case Bay had effective control of plain-

The parties have stipulated to the following facts. At all relevant times, Bay and his spouse owned one hundred percent (100%) of the stock in plaintiff corporations. In 1975, Bay acquired twenty-five percent (25%) of the St. Louis stock. C.J. Davis (also known as Carl J. Davis) and his wife, Genevieve Davis (also known as M. Genevieve Davis), owned the other seventy-five percent (75%) of the stock. In October, 1977, Bay and the Davises entered into a Stock Transfer Restriction and Buy–Sell Agreement, purportedly giving Bay and St. Louis an option to buy C.J. Davis' stock in the event of his death. C.J. Davis died in November of 1977.

St. Louis filed for Chapter 11[4] bankruptcy in 1979. St. Louis operated as debtor-in-possession until 1985 when the bankruptcy was converted[5] to a Chapter 7[6] liquidation. After the conversion, defendants assessed the withdrawal liability against St. Louis and filed a proof of claim with the bankruptcy court.

In 1980, during the bankruptcy, the Bays, the Davises, and St. Louis entered into an Agreement of Understanding and an Amended Agreement of Understanding, both purporting to transfer the remaining St. Louis stock to Bay.

In 1982, the Fourth Amended Plan of Reorganization for St. Louis was approved. St. Louis completely withdrew[7] from participation in defendant pension plan on December 31, 1984.

I held a two-day bench trial, at which the following additional facts were found: Genevieve Davis signed a stock assignment agreement on March 30, 1983 in which she sold all her shares of St. Louis stock to Bay. The assignment document was certified by a commercial bank and delivered to Bay's attorney on April 5, 1983. On April 11, 1983, Bay's attorney acknowledged the stock assignment and wrote a letter outlining Bay's plans to make the payments agreed to between the parties.

On October 31, 1985, after defendants assessed withdrawal liability, Bay's attorney wrote a letter to the attorney for Genevieve Davis and the estate of C.J. Davis in an attempt to rescind the stock assignment. Bay's attorney enclosed the stock certificates with the letter. Genevieve Davis rejected the attempted rescission.

The three questions before me are: (1) whether the stock transfer to Bay was valid; (2) if so, whether there was, or should be, a rescission of the transfer agreement (assuming the transfer was completed); and (3) whether it is possible for a person to have "effective control" of a bankrupt corporation for purposes of withdrawal liability under ERISA.

## II. Stock Transfer

Pursuant to the 1977 Stock Transfer Restriction and Buy–Sell Agreement, Bay held an option to purchase C.J. Davis' stock after Davis' death in November, 1977.[8]

---

tiffs and St. Louis and plaintiffs were a single employer with St. Louis).

4. 11 U.S.C. §§ 1101–1174 (reorganization).

5. *See* 11 U.S.C. §§ 706 and 1112.

6. *See* 11 U.S.C. §§ 701–728.

7. Since the parties have stipulated that St. Louis effected a complete withdrawal, there is no need to consider the provisions relevant to "partial withdrawals."

8. The 1977 Agreement provides, at § 1(d), p. 3:
"Notwithstanding anything in this Agreement to the contrary, in the event of death of Carl J. Davis even if M. Genevieve Davis shall survive him, the Corporation and then the remaining shareholders shall have an option to buy any shares owned by Carl J. Davis and M. Genevieve Davis as joint tenants [sic] or owned by either of

them individually. Further, notwithstanding anything in this Agreement to the contrary, in the event of the death of M. Genevieve Davis prior to the death of Carl J. Davis, the Corporation and then remaining shareholders shall have an option to buy any Shares owned by M. Genevieve Davis individually; the option to buy any Shares owned by Carl J. Davis and M. Genevieve Davis as joint tenants [sic] and by Carl J. Davis individually not to become effective until the death of said Carl J. Davis.
"Notwithstanding anything in this Agreement to the contrary, M. Genevieve Davis shall not be considered a 'remaining shareholder' as that expression or term is [set] forth in this Agreement and accordingly said M. Genevieve Davis shall have no option rights as to any Shares of the Corporation."
The rights granted to Bay through the agreement satisfy the requirements of an option since they "enable the holder to purchase the stock

Under ERISA, a person who holds an option to acquire stock is deemed the constructive owner of such stock. 26 U.S.C. § 1563(e)(1). The evidence indicates that Bay continued to hold the stock purchase option through the date of St. Louis' withdrawal. Bay, therefore, was the constructive owner of all shares of St. Louis stock when it incurred withdrawal liability.

I find that, in addition to being the constructive owner of St. Louis, Bay was the actual owner of one hundred percent (100%) of St. Louis' stock on the withdrawal date.

■ Plaintiffs argue that the 1983 stock transfer was invalid because it was never recorded in St. Louis' records and because the stock certificates were never endorsed over to Bay.[9] In Michigan, however, a stock assignment agreement is valid at the time of its making, *C.M. Hall Lamp Co. v. U.S.*, 201 F.2d 465, 468 (6th Cir.1953), and neither a failure to transfer certificates of ownership nor a corporation's failure to record a transfer in its books invalidates a stock assignment. *Cf. Rare Earth, Inc. v. Hoorelbeke*, 401 F.Supp. 26, 44 (S.D.N.Y. 1975) (Michigan law).

Plaintiffs argue also that the 1983 stock assignment was invalid because there was a condition precedent to the agreement that the reorganization plan be successful. There is no writing to this effect and there was no attempt at trial to present any parole evidence of the alleged condition.

### III. *Rescission*

Plaintiffs argue that Bay effected a rescission on October 31, 1985 by returning the stock certificates to Genevieve Davis' attorney with a letter expressing an intent to rescind the stock assignment agreement. Plaintiffs claim that the attempted rescission was effective and should relate back to the time the transfer was consummated. Plaintiffs argue, alternatively, that

I should use my equitable powers to rescind the stock transfer.

It is elemental that a party to an executed contract cannot rescind it *nunc pro tunc. See Lenawee County Bd. of Health v. Messerly*, 98 Mich.App. 478, 485, 295 N.W.2d 903 (1980), *rev'd on other grounds*, 417 Mich. 17, 331 N.W.2d 203 (1982) (*citing Hathaway v. Hudson*, 256 Mich. 694, 239 N.W. 859 (1932)) ("Rescission is an equitable remedy which is not a matter of right but rests in the sound discretion of the trial court.").

■ Executory contracts can be rescinded by proper affirmative action. *Federals, Inc. v. Edmonton Investment Co.*, 555 F.2d 577, 579 (6th Cir.1977) (debtor could have rescinded lease agreement by affirmative action while in Chapter 11 bankruptcy since lease agreement was an executory contract). Here, the 1983 stock purchase agreement was executed at the time of its signing in 1983. The right to rescind, unilaterally, terminated in 1983—two years before Bay attempted to rescind.

■ Plaintiffs ask me to rescind the contract pursuant to equitable principles. Rescission of executed contracts is available only where "[t]he erroneous belief of one or both of the parties ... relate[s] to a fact in existence at the time the contract is executed," *Lenawee County Bd. of Health*, 417 Mich. 17 at 24, 331 N.W.2d 203 (1982),[10] and where the non-injured party can be restored to the same status it enjoyed prior to the making of the contract, *Grabendike v. Adix*, 335 Mich. 128, 140, 55 N.W.2d 761 (1952).

Plaintiffs rely on *Lenawee County Bd. of Health, supra*, as support for their argument that the stock transfer should be rescinded due to mistake. There, the parties assumed that the land sold was fit for human habitation and would generate rent-

---

'presently at his election.'" *Mid–America Indus., Inc. v. United States*, 341 F.Supp. 597, 607 (W.D.Ark.1972), *rev'd on other grounds*, 477 F.2d 1029 (8th Cir.1973).

**9.** Plaintiffs claim also that the 1980 Agreement of Understanding, as amended, became void by its own terms for failure of the specified condi-

tions precedent. I need not reach this issue because the 1983 agreement transferred ownership to Bay before the date of withdrawal.

**10.** *Cf. Denton v. Utley*, 350 Mich. 332, 86 N.W.2d 537 (1957) (contract to release defendants from liability rescinded when latent injuries to plaintiff materialized later).

al income. Here, there was no such mistake of fact at the time the contract was made. The higher-than-expected tax liability imposed by the Internal Revenue Service was a risk that materialized after execution of the contract—not a fact in existence at the time of execution.

Plaintiffs rely also on *In re Fontana D'Oro Foods, Inc.*, 65 N.Y.2d 886, 493 N.Y. S.2d 300, 482 N.E.2d 1216 (1985), as support for their argument that the higher tax liability and the unexpected withdrawal liability frustrated the purpose of the stock transfer agreement. There, the trial court held that destruction of the warehouse and inventory of a business coupled with the insurance company's refusal to pay frustrated the purpose of the stock transfer. However, the Appellate Division reversed, 107 A.D.2d 808, 484 N.Y.S.2d 644, and the New York Court of Appeals affirmed the reversal, 65 N.Y.2d 886, 493 N.Y.S.2d 300, 482 N.E.2d 1216, on the grounds that the risk of loss under the contract had passed to the buyer before the property was destroyed.

In any event, the frustration of purpose doctrine does not apply to errors in prediction as to future occurrences or non-occurrences. A party cannot enter into a contract, expecting to make a profit, and then demand rescission when the deal turns out to be less lucrative than he had hoped. *See Grabendike, supra*, 335 Mich. at 140–141, 55 N.W.2d 761. Equally, Bay's alleged ignorance of the risk of incurring withdrawal liability was a mistake of law, not of fact, and is an inappropriate ground for rescission.

■ Finally, plaintiffs suggest that defendants' failure to disclose the risk of withdrawal liability to Bay mandates rescission. Defendants had no duty to disclose potential withdrawal liability during the Chapter 11 proceedings because no liability existed until the moment St. Louis withdrew from the Fund. *See Matter of Computerized Steel Fabricators, Inc.*, 40 B.R. 344, 348–349 (S.D.N.Y.1984) (where reorganized Chapter 11 debtor challenged pension fund's post-confirmation assessment of withdrawal liability that included pre-confirmation financial factors, court held that the fund's assessment was timely since it had no provable claim until the debtor withdrew). The court in *Computerized Steel* clarifies:

> Merely because the calculations of amounts in arriving at ... liability include pre-petition and pre-confirmation factors does not mean that such liability should be regarded as having accrued either during a pre-petition or a pre-confirmation period.... The entire liability was triggered when [the debtor] completely withdrew from the multiemployer plan....

40 B.R. 344 at 349.

### IV. *"Effective Control" in Bankruptcy*

■ Plaintiffs' final argument is that, even if they were "businesses under common control" with St. Louis under the literal terms of ERISA, they should not be held liable for St. Louis' withdrawal. They argue that *In re Challenge Stamping and Porcelain Co.*, 719 F.2d 146 (6th Cir.1983), carves out an apposite exception to withdrawal liability for situations in which bankruptcy prevents actual control by an entity that purchases the debtor.

*In re Challenge Stamping* has a more limited application than plaintiffs suggest and is distinguishable on its facts. There, the PBGC assessed withdrawal liability against corporations that purchased a debtor corporation in receivership. The purchase was made the day before withdrawal. The United States Court of Appeals for the Sixth Circuit reviewed the legislative history of ERISA and concluded:

> Congress was seeking to place responsibility (and liability) upon the party actually in control so as to insure that control would be exercised responsibly and for proper reasons; *i.e.*, no shifting of pension obligations, no multiple use of small business tax relief.... The purpose of the 80% regulation [26 C.F.R. § 11.414(c)–2(b)(2)(i)(A)] is obviously to find the party in *control*. When, by operation of bankruptcy law, a party is actually denied control, there is no reason to apply the regulation....

It must be stressed that this conclusion neither invalidates the regulation at issue nor establishes a *per se* rule in all bankruptcies....

*In re Challenge Stamping*, 719 F.2d 146 at 151.

Here, the debtor corporation was not in receivership. It operated as debtor-in-possession until the withdrawal date. Walter Bay was president of the corporation well before the withdrawal date and exercised actual control, as well as "effective control," of St. Louis under the statute. The facts here do not justify invocation of the *In re Challenge Stamping* exception.

## V. *Conclusion*

The primary purpose of ERISA is to "encourage the continuation and maintenance of voluntary pension plans for the benefit of their participants." 29 U.S.C. § 1302(a)(1). The only feasible way to ensure adequate funding for such plans without overburdening employers is to assess liability at the time of withdrawal. Accordingly, a purchaser of a contributing employer is generally responsible for assuming the employer's duty to maintain benefits promised to past and current employees.

█ I hold that plaintiffs and St. Louis were a single employer for ERISA purposes on the date St. Louis withdrew from Central States Southeast & Southwest Areas Pension Fund. This is a harsh result for plaintiffs and Bay. But, any other result would violate the principal purpose of ERISA. Bay was on constructive notice, before agreeing to purchase St. Louis, that St. Louis was making contributions to the Fund. It is just to require plaintiffs to assume responsibility for contributing to the Fund even if they and Bay were not specifically aware that legal liability might attach upon withdrawal. *Cf. Textile Workers Pension Fund v. Standard Dye and Finishing Co., Inc.*, 725 F.2d 843 (2d Cir. 1984), *cert. denied sub nom., Sibley, Lindsay & Curr Co. v. Bakery, Confectionery & Tobacco Workers Int'l Union of America*, 467 U.S. 1259, 104 S.Ct. 3554, 82

L.Ed.2d 856 (1984), (retroactive application of withdrawal liability to employers that withdrew before enactment of the MPPAA does not violate such employers' Fifth Amendment right to due process of law).

Accordingly, for the reasons set forth above, judgment will be entered declaring that plaintiffs were a single employer with St. Louis on the date of withdrawal.[11]

IT IS SO ORDERED.

---

**11.** Having determined this issue, I am willing to entertain a motion by defendants to compel interim payments between now and the time arbitration is concluded.