In re DYNAMIC ENTERPRISES, INC., Debtor,

DYNAMIC ENTERPRISES, INC., Plaintiff,

v.

FITNESS WORLD OF JACKSON, INC. and Martin Bloeman, Defendants.

Bankruptcy No. 381–00129.
Adv. No. 381–0065.

United States Bankruptcy Court, M.D. Tennessee.

Aug. 10, 1983.

Steve North, North & Baker, Nashville, Tenn., for plaintiff.

Robert H. Waldschmidt, Cosner & Waldschmidt, Nashville, Tenn., for defendants.

## MEMORANDUM

KEITH M. LUNDIN, Bankruptcy Judge.

The plaintiff/debtor seeks damages for breach of a franchise agreement. Several issues are presented: (1) whether the agreement between the plaintiff and defendants is enforceable; (2) whether the defendants are liable for goods and services purchased from the plaintiff; and (3) whether the defendants breached the agreement by failing to pay franchise fees and if so, what is the amount of recoverable damages. After review of the pleadings, briefs and arguments of the parties, testimony, depositions, exhibits and applicable authority, I find that the defendants are in breach of an enforceable franchise agreement and that judgment should be entered in favor of the plaintiff for $161,099.51.

The following constitutes findings of fact and conclusions of law as required by Rule 7052 of the Bankruptcy Rules.

The plaintiff, Dynamic Enterprises, Inc. ("Dynamic"), is a Tennessee corporation en-

gaged in the business of owning, operating, and franchising physical fitness centers under the trade name "Fitness World." During 1979, the defendant, Martin J. Bloeman ("Bloeman"), was a contractor doing construction work on health clubs for the plaintiff. Bloeman approached Dynamic about becoming more deeply involved in Dynamic's health club franchising. On or about November 1, 1979, Dennis Brandon, the president of Dynamic, and Bloeman negotiated an agreement granting Bloeman a franchise to operate a fitness center in Jackson, Michigan using the "Fitness World" trade name. The agreement provided that Dynamic would supply Bloeman and his corporation, Fitness World of Jackson, Inc. ("Fitness World"),[1] with a "system" of health club operation including equipment, a uniform color scheme, standardized fitness techniques, advertising, employee training, and technical consultation. Dynamic also would supply program charts, membership cards, brochures, contracts, t-shirts, body suits, and related items bearing the Fitness World name. The items and services were to be purchased on open account. Dynamic granted Bloeman an exclusive franchise for the Jackson, Michigan area, and Bloeman covenanted not to open competitive establishments or to acquire interests in other fitness centers. Bloeman paid a $10,000 license fee and agreed to pay Dynamic 10% of gross sales generated by the Jackson spa or any fitness center opened by Bloeman during the duration of the contract. The parties orally agreed to exempt the first $100,000 in sales from the fee arrangement. Bloeman signed the contract as guarantor of Fitness World's obligations.

Prior to his contract with Dynamic, Bloeman had never owned or operated a fitness facility and had no experience selling memberships to the public or staffing a health club. Dynamic and its president, Dennis Brandon, helped Bloeman and Fitness World select the location and secure a lease in Jackson, Michigan. Dynamic ordered equipment for the facility, arranged for

pre-opening advertising and brought in experienced staff to train new employees. Dynamic assisted in hiring defendants' staff for the Jackson spa, taught them how to sell fitness contracts, set up the accounting and record keeping systems, supplied clothing and supervised pre-opening sales of memberships for the defendants totalling approximately $100,000.

Fitness World opened in Jackson in mid-March of 1980 and tendered the required franchise fees from March, 1980 through May, 1980. Fitness World made no franchise payments after June, 1980. Despite the proscriptions against acquiring interests in other health clubs, Bloeman opened several other fitness centers in Michigan during 1980 and early 1981, including spas in Lansing, Waterford, Sterling Heights, Roseville, Southfield, Westland, and Southgate, all within a 100 mile radius of the Jackson fitness center. The centers opened under either the name Lady Spa or Sir Spa, but operated under substantially the same system as the Jackson facility. The other clubs were for women only (or men only) like Fitness World in Jackson, were managed through the same corporate infrastucture, used the same pre-opening and continuing membership sales concepts, used the same kind of equipment, workout cards and membership cards, and shared the same bookkeeping system. Management and employees from the Jackson spa were used to open and to train personnel at the other fitness centers opened by Bloeman.

In August, 1980, Dynamic discovered that it had not complied with Mich.Comp.Laws Ann. § 445.1501 *et seq.* (Supp.1982) ("Franchise Investment Law") by failing to register or file disclosure documents with the Michigan Department of Commerce prior to selling the Fitness World franchise to Bloeman. By letter dated September 25, 1980, Dynamic advised Fitness World and Bloeman of its willingness to rescind the contract. The letter advised Bloeman that Dynamic was preparing a formal rescission offer that would require Dynamic to return the license fee, together with interest, and

---

**1.** Fitness World of Jackson, Inc. was incorpo- rated November 23, 1979.

the defendants to return all income generated by the operation. On September 30, 1980, Dynamic submitted a proposed rescission to the Michigan Department of Commerce. The Department of Commerce has neither approved nor disapproved the rescission offer.

On January 31, 1981, Fitness World sold the Jackson, Michigan facility to American Fitness and Health Centers. Bloeman has continued to operate the other fitness centers under Fitness World's successor, Level Park Associates, Inc., incorporated on July 6, 1981. Total revenues generated by the health clubs owned by Bloeman between March, 1980 and September, 1981 was $1,742.027.

Dynamic filed a petition for relief under Chapter 11 on January 16, 1981 and filed a complaint against Fitness World to recover delinquent franchise fees and damages pursuant to the franchise agreement on February 6, 1981. Bloeman was added as an individual defendant on August 16, 1982.

A trial was held November 15, 1982.

## I. ENFORCEABILITY OF THE AGREEMENT

 Defendants challenge the enforceability of the franchise agreement. Under Michigan law,[2] the elements necessary to form an enforceable agreement are: (1) parties competent to enter a contract; (2) a proper subject matter; (3) legal consideration; (4) mutuality of consent; and (5) mutuality of obligation. *Detroit Trust Co. v. Struggles,* 289 Mich. 595, 286 N.W. 844, 846 (1939). Specifically, the defendants allege that the agreement is unenforceable because it was not signed by the corporation, that the agreement is void because violative of the Franchise Investment Law, and that the agreement fails for want of consideration. These issues were raised for the first time at trial. At the close of proof, the defendants moved to amend the pleadings to conform to the proof pursuant to Rule 15 of the Federal Rules of Civil Procedure, made applicable to bankruptcy proceedings by Rule 715 of the Federal Rules of Bankruptcy Procedure. The plaintiff alleged unfair surprise and objected to the introduction and consideration of these matters.

 Rule 15(b) provides in relevant part:

(b) Amendments to Conform to the Evidence ... If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or

2. Michigan law applies to determine the enforceability of the contract provisions despite the fact that the contract was executed in Hendersonville, Tennessee. Federal courts, including bankruptcy courts, apply the substantive law of the state in which the court sits. *See Erie Railroad Co. v. Thompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Thico Plan, Inc. v. Maplewood Poultry Co.,* 2 B.R. 550, 553 (Bkrtcy.D.Me.1980). Included within the state substantive law is that state's choice of law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *MacPherson v. MacPherson,* 496 F.2d 258, 261 (6th Cir.1974). Although the situs of contract formation is normally favored in contract interpretation, Tennessee courts have long recognized that the validity of contracts should be governed by the law intended by the parties. *First American National Bank v. Automobile Insurance Co.,* 252 F.2d 62, 64 (6th Cir.1958); *Deaton v. Vise,* 186 Tenn. 364,

210 S.W.2d 665, 668 (Tenn.1948); *Bowman v. Price,* 143 Tenn. 366, 226 S.W. 210 (1920). The intention of the parties should be determined from the terms of the agreement and, if not stated, then from an examination of all attendant circumstances. Considering the course of dealing between the parties, it is apparent that the parties intended that Michigan law be applied in enforcing and interpreting the contract. The defendants are Michigan residents. The plaintiff was engaged in franchising ventures in the State of Michigan. The operation was entirely conducted in Michigan. All goods, services and advertising were supplied in Michigan. The choice of appropriate law is also influenced by the necessary consideration of the Michigan Franchise Investment Law. Because the Franchise Investment Law plays such an important role in determining contractual validity and available remedies in this case, it is only equitable and practical that Michigan law be considered and applied.

defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

The court has considerable discretion to allow such amendments. *Esquire Restaurant, Inc. v. Commonwealth Ins. Co.,* 393 F.2d 111, 116 (7th Cir.1968); *Frito Co. v. N.L.R.B.,* 330 F.2d 458, 465 (9th Cir.1964). Rule 15 furthers the policy that lawsuits should be decided on the merits and not on procedural technicalities. Rule 15 motions are, therefore, liberally granted. *Davenport v. Ralph N. Peters & Co.,* 386 F.2d 199, 204 (4th Cir.1967); *Commissioner v. Finley,* 265 F.2d 885, 888 (10th Cir.) *cert. denied,* 361 U.S. 834, 80 S.Ct. 87, 4 L.Ed.2d 76 (1959); *Robbins v. Jordan,* 181 F.2d 793, 794 (D.C.Cir.1950). The court will not impose undue hardship on the other party, however, and before allowing amendment of the pleadings, the court must carefully determine whether the objecting party had a fair opportunity to present relevant evidence that would rebut the new defenses. *Ellis v. Arkansas Louisiana Gas Co.,* 609 F.2d 436, 439 (10th Cir.1979) *cert. denied,* 445 U.S. 964, 100 S.Ct. 1653, 64 L.Ed.2d 239 (1980); *Lomartira v. American Automobile Ins. Co.,* 371 F.2d 550, 552 (2nd Cir.1967). Amendments should not be granted if substantial prejudice inures to the objecting party. *United States v. 47 Bottles, More or Less,* 320 F.2d 564, 573 (3rd Cir.) *cert. denied,* 375 U.S. 953, 84 S.Ct. 444, 11 L.Ed.2d 313 (1963).

 Although the plaintiff asserted that he was surprised and would be prejudiced by the consideration of the defenses, the court is not persuaded that the plaintiff was sufficiently prejudiced or unable to defend on the issues presented to warrant denial of the defendants' motion or a continuance to allow the plaintiff to prepare additional proof. The plaintiff failed to allege with specificity any evidence or testimony that could have been produced by Dynamic if the defenses had been raised by earlier pleadings or at the pretrial conference. The facts surrounding the formation of the agreement and the conduct of the parties were well developed for the court. Justice would not be served if the defendants were denied a full and fair consideration of these issues. The court will, therefore, grant the defendants' motion and address the defendants' arguments individually.

## A. BINDING SIGNATURE

The franchise agreement provided two signature lines—one for Dynamic and one for Fitness World. Dennis Brandon signed as representative of Dynamic, but the Fitness World signature blank was not endorsed because Fitness World had not been incorporated on the date the contract was finalized. The contract was, however, guaranteed by Bloeman, the sole shareholder, incorporator, and future president of Fitness World. The defendants argue that because "Fitness World of Jackson, Inc." never signed the agreement, no contract was ever legally consummated. The court rejects this proposition.

 Although at common law, contracts made solely between individuals were not enforceable against a subsequently formed corporation, Michigan has eviscerated the common law notion of *prima facie* invalidity. The Michigan General Corporation Act, Mich.Comp.Laws Ann. § 450.8 (1967) provides that:

> No contract made by the incorporators for or on behalf of any corporation to be formed preliminary to the filing of the articles shall be deemed invalid or ineffectual because made prior to such filing.

*See also Hart Potato Growers Ass'n. v. Greiner,* 236 Mich. 638, 211 N.W. 45, 46 (1926). The Michigan statute is consistent with the economic reality that preincorporation contractual relationships are essential in promoting corporate viability, and providing immediate business opportunity upon incorporation. Subsequently formed corporations are not automatically and irreversibly bound, however, by the acts of promoters and incorporators. Individuals risk that their actions will not be ratified and that personal liability will ensue. The court must scrutinize the actions of the corporate entity following incorporation to determine

whether that corporation should be held liable on the particular contract. The Michigan Supreme Court noted in *Johnson & Carlson v. Montreuil's Estate:*

> American courts generally hold that a contract made by the promoters of a corporation on its behalf may be adopted, accepted or ratified by the corporation when organized, and that the corporation is then liable, both at law and in equity, on the contract itself, and not merely for the benefits which it has received.

291 Mich. 582, 289 N.W. 262, 264 (1939). If the corporation recognizes the existence of the contract and accepts the benefits bestowed under the contract, equity demands that the corporation also share the liabilities. Postincorporation, Fitness World of Jackson, Inc. affirmed and ratified the franchise agreement. Fitness World operated under the guidelines established in the franchise agreement. Fitness World tendered payments and license fees by checks drawn on a corporate account, accepted goods, advertising and other services and substantially complied with other terms of the franchise agreement. Fitness World never sought to reject the contract and instead operated consistent with the agreement. These acts constitute ratification and adoption of the preincorporation contract. *See, e.g., Leelanau Transit Co. v. Houdek,* 239 Mich. 101, 214 N.W. 142 (1927); *Transport Utilitor Sales Co. v. Zwergel,* 228 Mich. 132, 199 N.W. 668 (1924). Despite the absence of the corporate signature on the franchise agreement, Fitness World of Jackson, Inc. is bound by the agreement.

## B. VOIDABILITY

Defendants next argue that the franchise agreement cannot be enforced because Dynamic failed to comply with the Michigan Franchise Investment Law. This issue was previously addressed by this court in Fitness World's motion for summary judgment. The court held in its order of April 7, 1981 that the franchise agreement remained valid and enforceable between the parties despite the plaintiff's failure to register under the Franchise Investment Law. The order was not appealed. The court finds that the same result is appropriate as to defendant Bloeman.

The Michigan legislature could have followed the lead of some other states and adopted a franchise protection law which voids contracts for franchises which are not first registered with the state. Instead, the Michigan law does not nullify a franchise sale made without registration and disclosure.[3] Although the legislative history of the Michigan statute and interpretative case law are sparse, on its face the Franchise Investment Law limits an aggrieved franchisee to the remedy of rescission or an action for actual damages. The tendering of a rescission offer by the franchisor cuts off a franchisee's action for damages and makes rescission the exclusive remedy. Mich.Comp.Laws Ann. § 445.-1531(2) (Supp.1982). A franchisee that becomes aware of a violation of the Michigan Franchise Investment Law thus may move to rescind the contract by initiating its own action, may file an action for damages, may await the franchisor's offer of rescission, or may continue under the contract. The franchisee must evaluate which course of action is most advantageous. The franchisee may not, however, simply ignore the obligations imposed by the franchise agreement. Until rescission is effected, the parties continue to operate under the contract. The statute specifically preserves the franchisor's remedies for breach of the franchise agreement in the absence of rescission; Mich.Comp.Laws Ann. § 445.1534 (Supp. 1982) provides that:

> Except as explicitly provided in this act, civil liability in favor of any private party shall not arise against a person by impli-

---

**3.** Although the Franchise Investment Law has not been interpreted by a Michigan court, this interpretation is consistent with the views of other courts that have interpreted similar franchise statutes. *See Country Kitchen of Mt. Vernon v. Country Kitchen of Western Ameri-* ca, 293 N.W.2d 118 (N.D.1980); *Lulling v. Barnaby's Family Inns, Inc.,* 499 F.Supp. 1353 (E.D.Wis.1980); *Allison v. Medical International, Inc.,* 92 Wash.2d 199, 597 P.2d 380 (1979); *Martin Investors, Inc. v. VanderBee,* 269 N.W.2d 868 (Minn.1978).

cation from or as a result of a violation of a provision of this act or a rule or order hereunder. *Nothing in this act shall limit a liability which may exist by virtue of any other statute or under common law if this act were not in effect.* (emphasis added).

This interpretation of the Michigan law is consistent with the observations of the United States District Court in *Fargo Biltmore Motor Hotel Corp. v. Best Western International, Inc.,* 563 F.Supp. 1022 (D.N. D.1983). Citing state court decisions interpreting a North Dakota law similar to the Michigan Franchise Investment Law, the court in *Fargo Biltmore Motor Hotel Corp. v. Best Western International, Inc.* rejected a franchisee's claims that its contract was void:

> The North Dakota Supreme Court on at least two occasions has interpreted various provisions of the North Dakota Franchise Investment Law, North Dakota Century Code chapter 51–19. In *Country Kitchen of Mount Vernon, Inc. v. Country Kitchen of Western America, Inc.,* 293 N.W.2d 118 (N.D.1980), the court held that because the legislature has expressly provided exclusive remedies in the franchise investment act for violations of the act, and automatic invalidation of the contract is not among the remedies, the failure of a franchisor to register under the franchise law does not make void a contract between the franchisor and the franchisee. *Id.* at 121. Additionally the court has held that the remedy of rescission provided by the franchise law is the ordinary remedy of rescission, that at a minimum, before a franchisee may rescind a franchise agreement under the franchise law remedy statute, he must overcome any equitable defenses raised by the franchisor. (citation omitted).

563 F.Supp. at 1026.

The contract between Dynamic and Fitness World is thus not rendered void by

Michigan Law. In the absence of rescission (discussed below) Dynamic can maintain this contract action against its franchisee for breach of the franchise agreement.[4]

## C. ADEQUACY OF CONSIDERATION

██ Finally, the defendants assert that Dynamic does not have the right to exclusively market the "Fitness World" trademark or "system," therefore, the contract is unenforceable for lack of consideration. "[C]onsideration is the right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss or responsibility given, suffered or undertaken by the other." *Sambo's Restaurant, Inc. v. City of Ann Arbor,* 473 F.Supp. 41, 45 *rev'd on other grounds,* 663 F.2d 686 (6th Cir.1979). A written contract reciting consideration carries a presumption of consideration and the burden is on the party seeking to avoid the obligation to demonstrate the absence of consideration. *Harris v. Chain Store Realty Bond & Mortgage Co.,* 329 Mich. 136, 45 N.W.2d 5, 9 (1950); *Hinckley v. McLaughlin,* 182 Mich. 707, 151 N.W. 745 (1915). The court finds that the defendants have failed to prove the absence of consideration.

██ The court finds adequate consideration in two respects. First, the franchise agreement imposed a substantial forbearance on Dynamic. The defendants received the exclusive right to use the Fitness World system in the Jackson area. The agreement provides:

> 7. EXCLUSIVE AREA. During the effective term of this franchise and license, Licensor shall not grant to any other individual, association, firm or corporation any franchise or license to construct, maintain, or operate a similar establishment and/or adopt or use the System or

---

4. To hold otherwise would create an anomalous situation not envisioned by the Michigan statute. Accepting Dynamic's argument would allow a franchisee who knows of a franchisor's nonregistration to reap all the benefits of a franchise agreement and avoid all its contractu-al obligations. One would expect such a drastic change in the ordinary rules of contract to be explicit on the face of the statute. Instead one finds the clear preservation of the parties' normal contract rights in the section quoted.

said names or marks within Jackson County.

Dynamic was, therefore, precluded from operating competing franchises in the area. The defendants do not assert that Dynamic breached this covenant or that any competitor entered the market within the relevant time period. The defendants merely argue that somewhere others may be using the Fitness World trademark without Dynamic's approval. Although, the possibility that other entities were using the Fitness World logo and trade name may inject Dynamic into trademark infringement litigation (either as plaintiff or defendant), the existence of other Fitness World franchisors or franchisees outside the Jackson, Michigan area does not affect the validity or enforceability of the bargain between the two parties to this proceeding. The extent of exclusivity affects the value of the consideration, but does not affect the legality or sufficiency of the consideration for purposes of contractual enforcement. The court will not police contracts to determine whether a party made a wise bargain. As long as even a minimal consideration is present, the contract will be enforced. *Astroglass Boat Co. v. Eldridge,* 32 B.R. 538 at 546, n. 11 (Bankr.M.D.Tenn. 1983). Generally, a non-competition agreement alone is adequate consideration for enforcement of a contract. *See, e.g., Weiss v. Stein,* 187 Mich. 369, 153 N.W. 810 (1915); *Lee v. United States Graphite Co.,* 161 Mich. 157, 125 N.W. 748 (1910); *Up River Ice Co. v. Denler,* 114 Mich. 296, 72 N.W. 157 (1897).

■ The defendants also garnered substantial direct benefits from the franchise agreement. The provision of goods and services by Dynamic to Fitness World independently provides consideration for the agreement. The defendants received consultation, were assisted in the selection of the location of the spa, the color, decor, equipment, sales techniques, goods, services, advertising, and given other assistance in launching their fitness enterprise. The defendants were able to generate over $1.7 million in revenues after associating with Dynamic. Although the extent and value of these products and services is disputed, the defendants' argument that they derived absolutely no benefit from Dynamic strains the imagination.

## II. BREACH OF CONTRACT

### A. NONPAYMENT FOR GOODS AND SERVICES

The proof demonstrates that Bloeman and Fitness World received various goods and services from Dynamic but failed to tender complete payment. The total deficiency was proven to be $1,810.33. [*See* Plaintiff's Exhibit No. 2]. The defendants do not deny the nonpayment, but argue as a defense that the goods were never received or were defective. The defendants further argue that Dynamic failed to provide the extent of services expected under the contract. The court finds these defenses unpersuasive.

■ The defendants are liable for the value of goods received from Dynamic. The Michigan Uniform Commercial Code is applicable to transactions in goods. Mich. Comp.Laws Ann. § 440.2102 (1967). Mich. Comp.Laws Ann. § 440.2607 (1967) provides:

(1) The buyer must pay at the contract rate for any goods accepted.

(2) Acceptance of goods by the buyer precludes rejection of the goods accepted and if made with knowledge of a nonconformity cannot be revoked because of it unless the acceptance was on the reasonable assumption that the nonconformity would be seasonably cured but acceptance does not of itself impair any other remedy provided by this article for nonconformity.

(3) Where a tender has been accepted.

(a) the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy.

Unexcused failure to tender full payment constitutes an actionable breach. *See*

*Schware v. Derthick,* 332 Mich. 357, 51 N.W.2d 305, 309 (1952). The defendants have proffered no legitimate excuse for nonpayment. If the defendants were dissatisfied with the goods or did not receive goods for which they were billed, the defendants should have provided notice to Dynamic and an opportunity to cure the defective performance. Mich.Comp.Laws Ann. § 440.2508 (1967). Prompt notice is essential prior to asserting defenses and alternative remedies. The burden to demonstrate proper notice is on the defendants. *Atlas Concrete Pipe, Inc. v. Roger J. Au & Son,* 467 F.Supp. 830, 835 (E.D.Mich.1979). The failure to seek remedies by continuing to operate under the contract waives any breach. *Schnepf v. Thomas L. McNamara, Inc.,* 354 Mich. 393, 93 N.W.2d 230, 232 (1958).

The testimony of Bloeman and Brandon directly conflicted on the questions of performance and notice. Bloeman testified that Fitness World never received many of the goods or that they were in defective condition. Bloeman alleged that he informed Dynamic of the shortcomings and testified that he wrote letters and had numerous conversations with Brandon and Dynamic's managers in which he detailed his dissatisfaction with Dynamic's performance. The defendants, however, failed to provide one shred of corroborating evidence—not a single letter, memorandum, record or invoice—concerning the alleged defective performance by Dynamic, despite a court order compelling the production of such materials on November 3, 1982. Brandon testified that Dynamic had promptly shipped the goods and that in his numerous conversations with Bloeman during the relevant period of time, Bloeman never complained about Dynamic's performance. Weighing the testimony carefully, considering the witnesses' demeanor, and the reasonableness of their respective explanations, the court finds that Dynamic's version is the more credible. The defendants simply failed to carry their burden of demonstrating the defense.

Similar analysis is applicable to the defendants' assertions concerning the lack of supportive services. The defendants argue that advertising, promotion, training and consultation supplied by Dynamic were not satisfactory. The defendants failed to carry their burden to demonstrate that the services were ineffectively provided or that the defendants provided notice to the plaintiff or an opportunity to achieve compliance. The proof at trial weighs substantially to the contrary, including the testimony of the defendant's president, Martin Bloeman. At trial Bloeman admitted that he used the people trained by Dynamic and the system supplied by Dynamic—including the selling concept and the bookkeeping system—to open the other fitness spas Bloeman unilaterally established after contracting with Dynamic. Bloeman's use of the same people and the same "system" is inconsistent with his claim that Dynamic failed to satisfactorily train the Jackson personnel or to properly supply the components of the "system." Bloeman supplied no corroborating testimony, letters or other evidence to support his assertion that he complained about Dynamic's provision of support services or training. The proof demonstrates that Bloeman's claim that Dynamic's noncompliance with the contract excuses Dynamic's failure to keep its bargain is a recent fabrication. Bloeman's testimony at trial was clear: he stopped honoring the contract with Dynamic when he learned that Dynamic had failed to comply with the Michigan Franchise Investment Law.[5] Plaintiff is entitled to a judgment for goods and services in the amount of $1,810.33.

**B. NONPAYMENT OF LICENSE FEES**

The franchise agreement obligates the defendants to pay Dynamic a fee of 10% of gross sales. The agreement provides that:

> No proof was introduced to establish the nonpayment of construction fees or to connect the construction payments to the franchise agreement.

---

**5.** At one point in his testimony, Bloeman also mentioned that Dynamic was behind in its payments to Bloeman's construction company and that this contributed to Bloeman's decision to stop complying with the franchise agreement.

8. SERVICE FEES. For and during the terms of this Agreement, Licensee shall pay to Licensor as service fees, ten (10%) percent of the proceeds of gross sales and the same percentage of gross sales proceeds from any other fitness establishment operated directly or indirectly by Licensee or its stockholders by the 10th day of the following month. Licensee shall render to Licensor a full and complete operating statement, in such form as Licensor shall require of said establishment, and shall thereupon pay to Licensor ten (10%) percent of gross sales proceeds from the operation of said establishment.

With regard to the license fees on the Jackson facility, Fitness World made the required payments between March and May of 1980. No subsequent payments were made despite the continued operation of the facility. The defendants' defenses are rejected above and the court finds the defendants liable for the unpaid fees at the Jackson spa.

The defendants argue that they are not required to pay service fees from the operation of fitness centers other than the Jackson facility because the contract provision requiring these payments is unenforceable. The agreement precludes the defendants from opening or acquiring financial interests in other fitness centers as follows:

5. RESTRICTIONS ... Licensee agrees that, during the effective term of this Agreement, Licensee shall not, without the written consent of the Licensor first had and obtained, directly or indirectly, engage in, or acquire any financial or beneficial interest in exercise and fitness establishment, including any interest in corporations, partnerships, trusts, unincorporated associations and joint ventures, or otherwise directly or indirectly engage in the operation of an exercise

and fitness establishment, or use or duplicate said System or any portion thereof other than pursuant to this Agreement or pursuant to other written agreements with Licensor.

The opening of other facilities obligates the defendants to pay 10% of the gross revenues as license fees pursuant to paragraph 8, reproduced above.

The defendants correctly note that Michigan has a state antitrust law which forbids "agreements not to engage in any avocation, employment, pursuit, trade, profession or business." Mich.Comp.Laws Ann. § 445.761 (1967). Michigan case law also evidences public policy against covenants not to compete. See Muma v. Financial Guardian, Inc., 551 F.Supp. 119, 122 (E.D.Mich.1982); E.W. Smith Agency, Inc. v. Sanger, 350 Mich. 75, 85 N.W.2d 84, 86 (1957). Michigan law, however, makes a distinction between contracts which impose restrictions during performance of the contract and restrictions which extend beyond the expiration of the contract term. Extended geographical and chronological restrictions are in conflict with the policy of the state.[6] Restrictions on competition during the term of an agreement which are related to the subject matter or performance of the contract, however, are not within the scope of the antitrust prohibition and are generally enforceable. See, e.g., Tweddle v. Tweddle Litho Co., 80 Mich.App. 418, 264 N.W.2d 9, 10–11 (1978) (provision of profitsharing plan under which benefits were forfeited when employee engaged in competitive activities was valid despite fact that provision was unrestricted in time and area). This court is aware of no Michigan decision invalidating an "in term" restriction such as those imposed by the franchise agreement. The Attorney General of Michigan has noted that "research fails to disclose any Michigan appellate court decision

---

**6.** The court notes that even if paragraph 5 is voidable, the remaining contract provisions remain valid and enforceable because any illegal restrictions are specifically severable from the remaining portions of the agreement. The contract provides that:

15. SEVERABILITY. Should any part of this agreement for any reason be declared invalid, such decision shall not effect the validity of any remaining portion, which remaining portion shall remain in force and effect as if this agreement had been executed with the valid portion thereof eliminated.

which holds that a franchise agreement containing a covenant prohibiting the franchisee during the life of the franchise to engage in the same business to be invalid." 5620 Op. Att'y Gen. 531 (1980). The Attorney General further noted:

> [I]n the absence of clear legislative language prohibiting an interm covenant, there is no reason why a franchisor may not require a prospective franchisee to bind himself to devote his full attention to the operation of the franchise. . . . If a prospective franchisee finds such a covenant to be a burden, he is free to decline entering into the franchise agreement. Having entered into the franchise agreement and received the benefits of it, it is untenable to argue that he is deprived of the means of earning the livelihood or that the community will be deprived of his free and unrestricted efforts in the field of activity he has chosen.

5620 Op. Att'y Gen. 531, 532 (1980).

 The defendants have advanced no other argument why the provisions of paragraphs 5 and 8 of the contract should not be enforced. The requirement that Fitness World and Bloeman pay franchise fees on the other facilities which they admittedly patterned after and staffed from the Jackson spa equitably apportions the benefits and burdens of this contract as the parties agreed from its inception. The defendants knew from the plain language of paragraph 5 that they were obligated to pay fees on the gross receipts of other fitness centers which they owned or operated, directly or indirectly. There is no dispute that the defendants owned and operated other fitness facilities within the meaning of paragraph 5. There is also every indication that the defendants merely pirated what they learned from Dynamic at the Jackson Fitness World for use at the defendant's other spas. The restrictions, rights, and responsibilities imposed by paragraphs 5 and 8 of the contract clearly apply on these facts and defendants are liable to the plaintiff for unpaid service fees based on the gross sales at defendants' other facilities. The 10% fee called for in paragraph 8 is actually in the nature of liquidated damages. Although the parties contracted for the franchise of a single fitness center, the contract sets forth a remedy and measure of damages in the event the franchisee opened other clubs. The 10% fee represents a reasonable measure of recovery and the court will not question the adequacy of this remedy negotiated by the parties.

## III. AMOUNT OF RECOVERY

 The issue remaining is the amount of the plaintiff's recovery. The calculation of damages is somewhat complicated by the interrelated accounting used by the defendants in operating their fitness centers and by the extended time during which the agreement has been in operation. Dynamic has demanded payments and presented proof regarding the generation of revenues post-bankruptcy. The defendants offered no challenge to the inclusion of post-bankruptcy revenues in the calculation of damages. The cumulative financial statement submitted as plaintiff's Exhibit No. 5 indicates that Fitness World (and its successor corporation, Level Park Associates, Inc.) generated revenues of $765,569 in deferred contracts and $976,458 in actual contract sales for total gross sales of $1,742,027 for all clubs operated through September, 1981.

The defendants argue that it is improper to include deferred contracts in a calculation of "gross sales." The defendants argue that "gross sales" should be determined by the "accrual method" and that Dynamic is not entitled to a percentage of any revenues until actually earned under the contract with the customer. Dynamic argues that "gross sales" were to be determined on a "cash basis" and credited when a contract was sold. The franchise agreement is silent as to a definition of "gross sales." The proof, however, supports Dynamic's assertion of contractual intent. As Bloeman testified:

> Q: You understand, though, that the franchise agreement called for it being done on a cash basis?
>
> Bloeman: That's correct.

Q: And on the payments that you made, they were made on a cash basis based on the money received for the contracts within any given moment, is that correct?

Bloeman: That's correct.

(Plaintiff's Exhibit No. 6, Deposition of Martin J. Bloeman, August 20, 1982, pp. 16–17). Similarly, the course of conduct between the parties reveals that when the franchise was initiated, Fitness World began operating on a "cash basis" and revenues were calculated consistent with "cash basis" accounting practices. Franchise fee payments made by defendants during the early months of operation confirm that "gross sales" were intended to include deferred contract sales and were not limited to accrued revenues. It was not until Bloeman decided to ignore the franchise agreement that the accounting system was changed and the calculation of "gross sales" consequently changed.

Despite ample opportunity to present contrary evidence, the defendants relied primarily on their legal arguments to deny liability. Dynamic is, therefore, entitled to the full recovery demonstrated by its proof—10% of $1,742,027, or $174,202.70. The defendants, however, are not obligated for service fees on $100,000 of presale revenues at the Jackson club, excused from the arrangement, and $4,913.52 already credited as license fees. Allowing these adjustments, the plaintiff is entitled to a judgment for fees of $159,289.18.

## IV. AVAILABILITY OF RESCISSION

On the day of trial, for the first time, the defendants requested that they be allowed to rescind the franchise agreement. Further argument in the defendants' posttrial memorandum reveals that it is apparently defendants' position that they may avoid liability to the plaintiff entirely by now demanding rescission.

■■■ Defendants' assertions are wholly untenable. Under Michigan law, the party seeking rescission of a contract must prove three elements: (1) a seasonable assertion of the rescission right; (2) tender of the consideration and benefits received; and, (3) demand for repayment of any price paid. *See Mesh v. Citrin,* 299 Mich. 527, 300 N.W. 870, 872 (1941). The party seeking rescission must first return the other party to the pre-contract status quo, *McIntosh v. Fixel,* 297 Mich. 331, 297 N.W. 512, 518 (1941), and rescission is not available to a party who has failed to make payments required by a contract and is thus in default. *Hafner v. A.J. Stuart Land Co.,* 246 Mich. 465, 224 N.W. 630, 631 (1929). In *Mesh v. Citrin,* the Michigan court stressed the requirement that both parties be returned to the status quo *before* rescission is an available remedy. 299 Mich. at 527, 300 N.W. at 872. In the *Mesh* case, the party seeking rescission of the lease of a service station had remained in possession of the station for five months. Though the station had lost money during the five months of operation, the court denied rescission because the plaintiff could not return the goodwill and other intangible advantages received during the life of the agreement.

■■■ Under Michigan law, a party that fails to timely exercise a rescission waives the right. *Schnepf v. Thomas L. McNamara, Inc.,* 354 Mich. 393, 93 N.W.2d at 232. The party must act to rescind the contract within a reasonable time and equity will not permit undue delay. *Wall v. Zynda,* 283 Mich. 260, 278 N.W. 66, 68 (1938). In *Grabendike v. Adix,* 335 Mich. 128, 55 N.W.2d 761 (1952), the plaintiff entered into an oil-pooling arrangement and although knowledgeable of the facts entitling him to a rescission, waited six months until a dry well had been drilled before asserting the right. The court held that the six-month delay constituted a waiver of rescission. Waiver also occurs through conduct inconsistent with an intended rescission. Particularly, the party must not affirm the contract after ascertaining the facts giving rise to the right of rescission. *LeRoy Construction Co. v. McCann,* 356 Mich. 305, 96 N.W.2d 757, 759 (1959). A party is not entitled to rescission after electing to continue under the contract. *See Fargo Biltmore Motor Hotel Corp. v.*

 
*Best Western International, Inc.,* 563 F.Supp. at 1026.

The defendants have failed to timely assert their right of rescission and have effectively waived the remedy. Dynamic's attorney wrote Fitness World's attorney on September 25, 1980 that Dynamic was aware of its violation of the Franchise Investment Law and intended to propose a rescission to the Michigan Department of Commerce. Dynamic stated in the proposal that it would return the original franchise fee, together with interest, if Fitness World would return the revenues generated under the contract. The defendants did not agree to rescind and continued to operate the Jackson spa as well as the other fitness facilities. The defendants continued to operate under the Fitness World trade name, continued to use the same fitness system, and continued to sell memberships, long after they were aware of the grounds for rescission. The defendants acted in a manner entirely inconsistent with a desired rescission of the franchise agreement. Dynamic proposed rescission as an alternative remedy in its complaint filed February 6, 1981. On April 16, 1981, Fitness World filed its answer to the complaint and argued (erroneously) that the contract was only rescindable at the defendants' option, but asserted no right to rescission. The defendants did not express interest in rescission until trial and their posttrial brief filed December 14, 1982.

The defendants have not tendered to the plaintiff the consideration and benefits received pursuant to the contract. In fact, the defendants have not even suggested how the return of all benefits and reinstatement of the precontract status quo would be possible on the facts of this case. Presumably, the defendants would have to return to Dynamic all income generated by the franchised operation. *See* Mich.Comp. Laws Ann. § 445.1531(2). The defendants have not demonstrated willingness or ability to do so. As in *Mesh v. Citrin, supra,* and *Grabendike v. Adix, supra,* this is a case where rescission is neither practical nor equitable. As the court found in *Hafner v.*

*A.J. Stuart Land Co.,* 246 Mich. 465, 224 N.W. at 631, defendants herein seek equity but come into court with unclean hands—defendants are unquestionably in breach of the very agreement they now wish to rescind. For all of these reasons, the defendants are not entitled to rescission and are obligated for all liabilities and damages incurred pursuant to the franchise agreement.

### V. CONCLUSION

Accordingly, the court finds that the franchise agreement is valid and enforceable, was breached by the defendants by nonpayment for goods and services, and breached by nonpayment of license fees. Judgment will be entered in favor of Dynamic and against the defendants, jointly and severally, in the amount of $159,289.18 for delinquent license fees and damages and $1,810.33 for unpaid goods and services, for a total judgment of $161,099.51.