**In re SOUTHERN INDUSTRIAL BANKING CORPORATION, d/b/a Daveco, Debtor.**

**DILLON OIL TECHNOLOGY PARTNERS, Plaintiff and Counter-Defendant,**

v.

**BANK OF COMMERCE, Defendant and Counterclaimant.**

Bankruptcy No. 3–83–00372.

Adv. No. 3–83–0880.

United States Bankruptcy Court, E.D. Tennessee.

Jan. 10, 1985.

---

Somers & Altenbach, A.O. Bracey, III, Atlanta, Ga., Arnett, Draper & Hagood, Jack B. Draper, Knoxville, Tenn., for plaintiff and counter-defendant.

Frantz, McConnell & Seymour, E. Bruce Foster, Jr., Robert L. Kahn, Knoxville, Tenn., for defendant and counterclaimant.

---

1. The unpaid balance on the consumer installment loans, including unearned interest, exceeded $2,260,000.00 on the purchase date.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

This case involves a question of the plaintiff's rights under a prepetition agreement whereby plaintiff purchased installment loans from the debtor in exchange for a substantial sum of cash. Plaintiff seeks either rescission of the purchase agreement or a declaration of its rights and an award of damages. Contending the consideration plaintiff paid for the loans purchased is inadequate, defendant asserts a counterclaim.

### I

Plaintiff Dillon Oil Technology Partners (Dillon) is a Pennsylvania limited partnership. Louis F. Coppage is a general partner in Dillon. Defendant Bank of Commerce is the successor in interest of the debtor, Southern Industrial Banking Corporation (SIBC), a former industrial loan and thrift company.

Shortly before filing its chapter 11 petition on March 10, 1983, SIBC was confronted with an urgent need for cash in order to meet depositor withdrawal demands. The SIBC board of directors decided to sell loans having a represented value of approximately $20,000,000.00. On February 23, 1983, acting through Coppage's counsel, Dillon entered into an agreement with SIBC resulting in its purchase of seventy-eight (78) consumer installment loans and one commercial loan in exchange for $1,500,000.00 cash. The total represented value of the installment loans, based on current payoff figures, was $1,348,178.58;[1] the one commercial loan was valued at $472,869.76. With a single exception the loans purchased by Dillon are payable in less than ten years from the February 23, 1983, purchase date.[2] After Dillon wire transferred $1,500,000.00 to a SIBC bank account on February 28, 1983, the notes representing the loans purchased and the accompanying loan documents were deliv-

2. Approximately thirty (30) percent in number of the loans mature in five years or less from the purchase date.

ered to its attorney. However, the obligors on these notes continued to make payments to SIBC because they were not notified of Dillon's interest.

SIBC continued as a debtor in possession only until April 18, 1983, when the court ordered the appointment of a trustee due to gross mismanagement of the affairs of SIBC by its current management. 11 U.S.C.A. § 1104(a)(1) (1979). When the SIBC trustee discovered he was receiving payments on loans previously sold to Dillon, he established an escrow account to segregate the payments. He declined to turn over the escrowed funds pending an investigation of the prepetition transfer to Dillon. On October 24, 1983, Dillon filed a complaint against the SIBC trustee seeking either rescission of its purchase agreement or enforcement of the agreement, including recovery of damages "in an appropriate amount [from the escrowed funds]" and a declaration of its rights. In conjunction with his answer denying Dillon is entitled to either rescission or damages, the trustee asserted a counterclaim on the theory that the $1,500,000.00 consideration paid by Dillon for the SIBC loans is inadequate.

A reorganization plan proposed by the trustee, providing in part for the merger of SIBC and the Bank of Commerce, was conditionally confirmed on November 28, 1983. After the fulfillment of certain conditions an order was entered establishing January 20, 1984, as the effective date of confirmation. Bank of Commerce, as successor in interest to SIBC, began doing business on January 30, 1984. Pursuant to an agreed order, the Bank has accordingly been substituted for the SIBC trustee as the defendant in the instant action.

On February 27, 1984, the court entered an order reciting the agreement between Dillon and the SIBC trustee that Dillon is the true and lawful owner of the consumer installment loans purchased from SIBC in February 1983.[3] The agreed order further recites that Dillon, or its designee, has the "sole and exclusive right to collect, receive and unconditionally own" all amounts paid on the loans purchased. Payments previously collected and deposited by the trustee in an escrow account were to be held pending further order. This order also provides:

> [T]he Trustee and/or Liquidating Trustee shall, jointly with Dillon, notify each borrower and the commercial debtor that all installments of principal and/or interest due and owing from and after the date of this ORDER shall be paid only to Dillon or its agent or designee.

Nevertheless, the payors of the loans purchased by Dillon from SIBC still have not received notice of Dillon's interest.

According to the Bank's reply brief, filed on October 30, 1984, payments aggregating $420,972.23, plus $9,559.24 in late charges, have been deposited in the escrow account. The sum of $308,899.81, composed of $284,509.42 in collections and $24,390.39 interest earned on the escrow, has been turned over to Dillon.

Bank of Commerce represents that it still is receiving payments on the loans sold by SIBC to plaintiff. Alternatively to its request for additional consideration, the Bank requests compensation for its services in "receiving, handling, recording and accounting for payments" on these loans.

## II

The February 23, 1983, agreement between Dillon and SIBC provides for a nonrecourse sale of the loans and related security documents, subject however to the covenants, representations and warranties recited in the agreement. Although stopping short of guaranteeing collection or payment, SIBC did warrant:

> All of the Loans and Loan Documents have arisen from bona fide transactions and are genuine, valid, binding and enforceable in accordance with their terms; ... any security interests, liens, and encumbrances created by the Loans and

---

3. In a separate attachment to this order eighty (80) loans are described by name of the obligor and account number. The last two loans in the list are not included among the seventy-eight (78) enumerated in Exhibit B to the parties' stipulation (Trial Exhibit No. 1).

Loan Documents are ... perfected liens or security interests ... which have been perfected for more than three (3) months....

The agreement further provides that SIBC "will promptly notify each Borrower" that all further payments shall be made to Dillon. SIBC agreed to remit to Dillon, not later than the day after receipt, all future payments on the loans it received. Under the terms of the agreement Dillon has the right, but not the obligation, to initiate collection procedures.

### Rescission

■ The remedy of rescission of a contract is "available only under the most demanding circumstances." *Robinson v. Brooks*, 577 S.W.2d 207, 208 (Tenn.Ct.App. 1978), *cert. denied.* "[T]he general rule is that rescission will not be permitted for a slight or casual breach of the contract, but only for such breaches as are so substantial and fundamental as to defeat the object of the parties in making the agreement." 17A C.J.S. *Contracts* § 422(1) (1963). Ordinarily a contract may not be rescinded due to a partial failure of consideration not affecting the entire contract. *Farrell v. Third National Bank*, 20 Tenn.App. 540, 548, 101 S.W.2d 158, 163 (1936), *cert. denied.*

■ Undeniably, SIBC breached both its agreement to give notice to the payors on the loans of Dillon's interest and its promise to remit payments received on the loans not later than one day after receipt. Also, the SIBC warranty relative to perfection of liens is untrue. The deed of trust purportedly securing the single commercial loan is neither acknowledged nor recorded.[4] However, the object of the agreement between Dillon and SIBC, a cash sale of notes held by SIBC, has not been defeated. Further, as previously noted, Dillon and the SIBC trustee presented an agreed order, entered on February 27, 1984, reciting that Dillon is the true and lawful owner of the consumer installment loans in question. Pursuant to this order, a sum in excess of $300,000.00 has been tendered to and accepted by Dillon. Submission of the agreed order and Dillon's acceptance of monies collected on the loans are acts inconsistent with its request for rescission.

### Damages

Alternatively to rescission, Dillon seeks a declaration of its rights under the purchase agreement and damages for breach of warranty, plus attorney fees and expenses.[5]

When Dillon defaulted on its right under the purchase agreement to select the loans it was to receive, SIBC employees selected the loans to be delivered to Dillon. Most, if not all, of the loans sold to Dillon are purportedly secured by real estate.

The single commercial loan in the package sold to Dillon had been previously purchased, on January 17, 1983, by SIBC from Knox Federal Savings & Loan Association. The indebtedness is evidenced by a renewal note, dated March 2, 1983, in the principal amount of $472,869.76, payable to SIBC by First Union Investment Inc. The payment schedule requires fifty-nine (59) monthly payments of $6,150.00 each, beginning April 5, 1983, followed by a final payment of $452,186.80. An undated deed of trust covering a 3.526-acre tract in Anderson County, Tennessee, apparently was intended to secure the First Union Investment note. However, this deed of trust was never recorded. The deed of trust and

---

**4.** Unrecorded deeds of trust are "null and void as to existing or subsequent creditors of, or bona fide purchasers from, the makers without notice." Tenn.Code Ann. § 66–26–103 (1982).

**5.** Dillon filed a proof of claim on November 25, 1983, for the unstated "sum of all consumer note payment proceeds [on notes sold to Dillon] received by the debtor and ... its Trustee...." Bank of Commerce maintains that Dillon's claim for damages, attorney fees, and expenses is outside the scope of both Dillon's proof of claim and its complaint. Further, Bank of Commerce argues such claim is barred by the confirmation of the SIBC trustee's plan. See 11 U.S.C.A. § 1141(d). Due to the conclusion the court has reached, it is not necessary to address the Bank's argument.

note are both signed by C.H. Butcher, Jr., former chairman of the board of SIBC.

Dillon asserts the First Union Investment note is worthless and that it is entitled to damages in the amount of the note, plus attorney fees and expenses. The damage claim is founded on the SIBC warranties that: (1) the loans sold represent bona fide transactions between SIBC and the obligors; and (2) all encumbrances or liens arising from the loan documents are perfected. Dillon's proof does not establish, nor can the court infer, that the First Union Investment indebtedness to SIBC is not the result of a bona fide transaction. But, the warranty relating to perfection of liens has been breached.

■ Generally, where a contract is breached damages are recoverable in an amount sufficient to put, insofar as possible, the party injured in the same position he would have been had the contract been performed. An award of damages for breach of contract should not put the injured party in a better position than performance under the contract would have. *Action Ads, Inc. v. William B. Tanner Co.*, 592 S.W.2d 572, 575 (Tenn.Ct.App. 1979), *cert. denied.* Conjecture and speculation are insufficient to permit an award of damages. *Wilson v. Farmers Chem. Ass'n*, 60 Tenn.App. 102, 111, 444 S.W.2d 185, 189 (1969), *cert. denied.* Prior to any award the fact of damage must be certain. *See United Am. Bank v. Keck*, 3 B.R. 517, 520 (Bankr.E.D.Tenn.1980).

■ Although Dillon asserts the First Union Investment note is worthless, the proof in the record is insufficient to permit a valuation of the note. James Steiner, the former SIBC president, testified that he believed the market value of the note exceeded the SIBC investment as of February 23, 1983. However, Steiner's belief is apparently based on an uncertified First Union Investment financial statement dated December 31, 1981, showing a stockholder equity of $3,781,702.00.[6] When asked,

"What was First Union Investments, or what is it?", Steiner responded that he did not know. He had no knowledge of the value of the First Union Investment note as of May 8, 1984. Further, there is no evidence relative to either uncollectibility or payments on the note. Dillon has failed to establish it sustained any damage in fact due to the SIBC breach of warranty relative to the perfection of lien instruments.

■ Dillon's request for the recovery of its attorney fees and expenses in connection with both this adversary proceeding and the SIBC bankruptcy case is also denied. Absent either contractual agreement or a statutory right each party to a lawsuit ordinarily bears the expense of his own attorney fees. *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975); *Goings v. Aetna Casualty and Sur. Co.*, 491 S.W.2d 847, 848 (Tenn.Ct.App.1972), *cert. denied.*

Dillon is entitled to the immediate turnover of the escrow funds and to receive all future payments on the loans it purchased in accordance with the explicit terms of the February 23, 1983, purchase agreement. Also, Dillon is entitled to receive from Bank of Commerce any and all information regarding payments on the loans purchased by Dillon.

*Bank of Commerce Counterclaim*

The gravamen of the counterclaim by the Bank of Commerce arises from the following provision of the purchase agreement:

[SIBC] and Coppage [Dillon's general partner] agree the total amount of loans, at par value, to be delivered to Coppage shall be at least one hundred twenty percent (120%) of the purchase price. The excess of Loans above purchase price shall be a reserve against which Coppage may charge any payments and other sums due under the Notes, and not paid by the respective borrower. At such time as Coppage shall recover the principal sum of $1,500,000.00 together

---

**6.** The asset section of this financial statement reflects a value of $3,543,444.00 in stock in eleven Tennessee banks, most or all of which have failed since December 31, 1981.

with interest thereon equal to the average yield of the Loans purchased, Coppage shall reassign to the Company, without recourse, all Notes and Loan Documents representing obligations of borrowers which have not been satisfied. Dillon maintains this provision, as expressly recited, merely entitled it to a reserve to protect its investment and that adequacy of consideration is not an issue, due to its obligation to reconvey after recovering $1,500,000.00 principal plus interest. In contradistinction, Bank of Commerce asserts the agreement between SIBC and Dillon is commercially unreasonable and that it does not represent an arm's length transaction. According to the Bank of Commerce, Dillon should be required to pay an additional consideration of $394,087.63.[7]

The Bank concedes that Dillon could not be made whole through a current sale of the entire loan package. Nonetheless, the Bank insists it is entitled to the additional consideration requested. According to the Bank, any diminution in value of the loan package is attributable to Dillon's failure to service the loans.

 Consideration for a contract may be adequate even though the benefit conferred is unequal to the responsibility assumed. *Danheiser v. Germania Savings Bank & Trust Co.*, 137 Tenn. 650, 194 S.W. 1094 (1917). It is not the office of the court to "police contracts to determine whether a party made a wise bargain." *Dynamic Enterprises, Inc. v. Fitness World*, 32 B.R. 509, 518 (Bankr.M.D.Tenn. 1983). A court should not interfere where the parties to a contract have knowingly and deliberately agreed upon a price. *Pipkin v. Lentz*, 49 Tenn.App. 206, 218, 354 S.W.2d 87, 92 (1961), *cert. denied.*

 In February 1983, faced with an acute need for cash, SIBC offered to sell to Dillon loans with a payoff value exceeding $1,800,000.00 in exchange for $1,500,-000.00, provided that Dillon reconvey any unpaid loans after it recovered its principal investment plus interest at a rate equal to the average yield on the loans purchased. Expecting only to earn a favorable rate of interest, Dillon did not anticipate any gain on its principal investment.[8] Indeed, none could be achieved due to the reconveyance term. Since Dillon's recovery of its principal investment is not guaranteed, any diminution in value of the loan package due to the absence of servicing activity would appear to be mutually detrimental. Further, the purchase agreement explicitly provides that Dillon was not obligated to initiate collection procedures. Under these facts the court fails to see any merit in the Bank's contention it is entitled to additional compensation.

 Bank of Commerce also seeks to recover a service fee of $21,048.62, representing five (5) percent of the principal amount deposited in the escrow account, plus $9,559.24 in late charges collected through the efforts of the SIBC trustee and the Bank, plus $8,766.25 for legal expenses incurred by the Bank as a consequence of its attorneys' involvement in communications related to inquiries about loan balances, payoff amounts, delinquent status, and other similar information. Louis Coppage testified he never dreamed that Dillon would be asked to pay service charges. In fact, the purchase agreement between Dillon and SIBC provides:

> 3.04 Brokerage Fees and Commissions. The Company [SIBC] represents and warrants that no brokerage fees, commissions or other selling or servicing charges are due or owing on any of the Loans, and that no such fees, commissions or charges are or will every [sic] become due with respect to the transac-

---

7. This amount equals the sum of $73,039.29 plus the difference between $1,821,048.34, the purported payoff value of the notes delivered to Dillon, and the $1,500,000.00 consideration Dillon paid. The $73,039.29 figure represents the credit life insurance premiums deducted from the balance owing when the payoff value was computed. This amount should not be deducted, according to the Bank of Commerce, since the loans (and credit life insurance) remain in effect.

8. Deposition of Louis F. Coppage at 27–28.

tions contemplated by this Agreement as a result of any action taken by the Company.

Although the purchase agreement provides it is binding upon the successors and assigns of both SIBC and Dillon, the bankruptcy of SIBC has intervened. Under the trustee's reorganization plan, Bank of Commerce did not assume the obligations of SIBC recited in the purchase agreement. Also, Dillon's proof of claim, filed on November 25, 1983, recognizes a setoff right for reasonable expenses in posting payments and calculating payoff amounts on the loans it purchased. Because the Bank's passive collection activity—no active effort was made by Bank of Commerce to collect the loans—benefited Dillon, it is entitled to $12,629.17, representing three (3) percent of the principal deposited in the escrow, on a quantum meruit basis. Late charges totaling $9,559.24 should be divided equally between the Bank and Dillon. Although collected through the efforts of the trustee's staff and the Bank's employees, these late charges were owing on money invested by Dillon. The legal expenses incurred by the Bank represent a cost of doing business and are not recoverable from Dillon.

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.