Edwin R. McCredie v. Elizabeth Buxton; and Elizabeth Buxton v. Edwin R. McCredie.

*Equity jurisprudence:  Title to lands:  Improvements  not  made  in  good  faith.* Where one after having tried to cheat another out of his estate by dealings behind his back with a third, and having so far succeeded as to get a colorable title, thereupon on the assumption that his inequitable conduct has gained him a position which assures success proceeds, in his own wrong and without misleading conduct by the innocent party, to expend money on the estate according to his own notions, and irrespective of the utility of the mode of expenditures to the true owner, and, then comes into equity to enforce his pretensions and get a ratification of his doings and title, the court will not aid him, on the one hand, by directly giving him the estate, or, on the other, by obliging the innocent object of such inequitable proceedings to pay him, at the peril of yielding the estate to him, any indemnity for his wanton expenditures.

*Improvements made on lands of another: Wanton expenditures.* But while in such case the equity of the unoffending party should be protected in all its integrity, *penalties* should not be imposed on the offending one; and the latter should be subjected to no greater losses than are fairly and practically incident to the due protection and relief of the former, and such as must be taken as self-inflicted by the wrong-doer.

*Submitted on briefs October 28.    Decided February 26.*

Appeal in Chancery from St. Clair Circuit.

*Divine & Wixson* and *Ashley Pond,* for McCredie.

*A. E. Chadwick* and *G. V. N. Lothrop,* for Buxton.

GRAVES, CH. J.

This is an appeal from the circuit court for the county of St. Clair in chancery.

It appears by the record that in 1844, one Jacob Buell was at work under contract for John P. Phillips, in St. Clair county, and requested Phillips to enter for him the northwest quarter of the northwest quarter of section thirty-two, in town ten north, of range sixteen east, and that Phillips, in compliance with such request, made the entry in his own name, with the understanding that he would convey to Buell when the latter should complete his job;

that Buell performed the work, so that the land in equity belonged to him. No patent was then issued, however, and it did not emanate in fact until the 15th of July, 1848, and was not received by Phillips until 1870.

In the meantime Buell assigned his equitable title, and it was transferred from one to another until it vested in Randall E. Davis, in 1849, and some little time thereafter, Phillips, at his request, recognized by writing his right, and promised to convey to him as soon as he, Phillips, should receive the patent.

It is claimed that after the right of Buell was vested in R. E. Davis, and after the first application of the latter to Phillips, an arrangement was made between R. E. Davis and his immediate assignor, one Robbins, for the rescission of this assignment. This statement comes from Davis, but his subsequent conduct is quite inconsistent with it.

He retained the written evidence, and there is no pretense that Robbins has ever made any claim, or done or said any thing to imply or indicate that R. E. Davis was not absolute owner of the equity.

Davis afterwards assumed to be owner, and demanded a deed in that character from Phillips, and finally the weight of evidence is, that Phillips conveyed to him on the ground that he represented himself to be, and appeared to be, the owner. And as both the parties to this litigation trace their titles to him, I am not inclined to lay stress on this version now given by him in the supposed interest of McCredie. The most indulgent view of his conduct and of this representation is not flattering.

Whilst he was asserting his ownership of the equity, and in 1850 and 1854, he permitted the land to be sold for delinquent taxes, and bid it in, and obtained two deeds from the auditor general. The first was given October 19, 1853, and the second, December 17, 1856.

On the 12th of October, 1867, he quit-claimed some twenty-six or twenty-seven acres off of the west side of the forty, to his brother, Simon Peter Davis, for the considera-

tion of two hundred dollars, and this is the parcel in controversy. At this time he claimed to have a complete equitable fee, in virtue of the right derived originally from Buell and acknowledged by Phillips, and also a paper title, such as it was, in virtue of the deeds made by the auditor general.

This deed to his brother was sufficient to transfer whatever interests he possessed.

On the same day this grant was made to his brother, the latter gave a warranty deed for the same land to Elizabeth Mitchell for the consideration of four hundred dollars, and Mrs. Mitchell and her husband, on the 18th of August, 1868, gave their warranty deed for the land to Mrs. Buxton for one hundred dollars, but subject to a mortgage of three hundred and thirty dollars. These deeds were all seasonably recorded.

The two latter deeds were in form sufficient to convey the whole interest, and the consideration of each was the fair value of the fee simple.

The several claimants, from R. E. Davis down, occupied as owners.

McCredie resided not far off, and was anxious to get a portion or the whole of this parcel, and he talked with Mrs. Buxton about buying a small piece of her, and he admits in his testimony that he proposed to her to write Phillips in her behalf, in regard to her buying, as he represents it, and that he offered to lend her money to accomplish it, and that she assented to his proposal to write, and that he did write and inquire what the land could be bought for, but got no answer.

He knew perfectly well that she was in possession and claiming to be entitled to full ownership.

In this state of things he began negotiations on his own account to obtain a conveyance of the outstanding naked legal title to himself, and the result was, that in a short time the patent reached Phillips, and he, on the 10th of September, 1870, quit-claimed the forty to Randall E. Davis,

as the equitable owner in virtue of the arrangement before mentioned, and Davis, disregarding his own former grant, gave, on the 12th of November, 1870, a warranty deed to McCredie of this parcel. The date of this conveyance, and the testimony of McCredie and of Wildman Mills as to the time that McCredie assumed to take possession, do not correspond.

The testimony referred to states that he took possession in October, 1870, or about a month before he got the deed. This is, however, not very important, even though the act of possession intended should be found to be the act of attempting to survey the property when a difficulty occurred.

Either at the time thus alluded to, or at all events very soon after, McCredie went on to the premises with Mr. Galbraith, county surveyor, to survey the premises, or a portion of them, into village lots, and on this occasion there was a violent altercation between him and Mrs. Buxton. She resented very warmly the course he had taken to cut her out of her right, and insisted that she was owner, and that he had no right there, and was not entitled to enter, or presume to exercise any act of ownership. She demanded that he should leave, and her language was more than earnest. He, in turn, claimed to be owner, and refused to leave. He made her an offer of money, which she indignantly refused, and she made known, in terms quite unmistakable, that it was her fixed purpose to stand upon her just rights. There was no possibility of inferring that she would waive any thing, or acquiesce in McCredie's claims. He was bound to understand that whatever he did there, would be at his own peril and risk.

After all these admonitions of danger, and with so much knowledge of adverse equities, he proceeded in the next spring to put up a large barn on the land, make a cellar for a store, and build a string of board fence, parallel with the road, and some two rods back of it.

In July, Mrs. Buxton again went upon the premises and fixed up a little temporary shanty, and proceeded to

occupy it with several of her children. She insisted upon her right to stay there, and avowed her purpose to do so. McCredie insisted that she should not remain, and after much exhibition of temper, and a good deal of harsh language, he resorted to force. She resisted, but he at length expelled her by violence. He then caused her to be arrested under some kind of a charge, and she was taken by an officer. There are many facts in the record which serve to color the whole controversy, but which it is not needful to recapitulate.

A few days later he filed a bill in the circuit court for the county of Sanilac, in chancery, against her, basing it on the statute, *Comp. L.,* § *5072,* to quiet his alleged title, and compel her to release to him,

The statements of his bill were mostly vague and general, and he gave no explanations whatever respecting the derivation of his title. He alleged merely that he was owner in fee.

Mrs. Buxton thereupon filed what throughout has been treated on all sides as a cross-bill, and both parties answered.

In what is called the cross-bill, she assumes to explain the controversy, and the facts relating to title, and insists upon relief as though her bill were an original one, based on the statute before mentioned.

No objection has been taken, that her bill is not properly a cross-bill, and is in substance an original one; and if such an objection might have been taken, I see nothing in the circumstances to warrant the court in declining to recognize the waiver of it.

In alluding to this it is not intended to indicate any opinion as to what view would have been taken here of such an objection. The only purpose is to exclude any implication to which the silence of the court might possibly be thought to give rise.

The parties proceeded to take proofs, and then transferred the cause to the circuit court for the county of St. Clair, in chancery, and, upon hearing, that court dismissed

the bill filed by McCredie, and in regard to that of Mrs. Buxton, decided she was entitled to the property, and that McCredie ought to release to her; but that the maxim, that one seeking equity must do equity, applied to the situation and circumstance as against her, and required of her, as a condition precedent to the protection of her right and the compulsion of McCredie to release to her, that she should pay him for his operations on the premises one thousand dollars, less one hundred and fifty dollars allowed for the use of the land three years. Both parties appealed.

It was conceded below, and is here, that the tax titles were invalid.

The case is extremely clear that the court decided accurately in dismissing McCredie's bill and in holding that Mrs. Buxton was entitled to the property and to a release from McCredie, and it would be a waste of time to reproduce or descant upon the facts bearing on this branch of the decision.

The only feature in the litigation presenting a semblance of difficulty is the allowance to McCredie, and in that I cannot help thinking the decree was a miscarriage.

The maxim invoked to justify the allowance appears to me misapplied when the state of the case and the facts are considered.

The actual circumstances naturally direct the mind to other maxims and propositions of equity. "He who hath committed iniquity shall not have equity," is not an unimportant one.—*Fonb.*, B. 1, ch. 2, § 13, and n. p. "A tortious act can never be the foundation of an equitable title."— *Sir William Grant*, in *Cholmondeley v. Clinton*, 2 Mer., 171, 357; *Hopkins v. Hopkins*, 1 Atk., 581. "A court of equity will not relieve a party from the consequences of a risk which he voluntarily assumes."—*Patterson v. Brown*, 32 N. Y., 81. "It is naturally just that what belongs to one shall not without his consent or fault be acquired by another."

Now, McCredie was the aggressor in the transaction in

question, and in the litigation, and the bill filed by Mrs. Buxton, upon the construction conceded to it on all sides, was defensive in its nature, and was filed to obtain a complete determination of the matter involved in the litigation begun by McCredie. She was not in fault, and never assented to his pretensions. And when we survey the cause, and observe the position and ability of the parties, the nature of the controversy, the value of the little parcel of land in dispute as it was before McCredie seized it, and contrast this with the amount of expenditure charged and allowed, and notice the inutility of those expenditures to Mrs. Buxton, it seems hardly possible to escape the conclusion, that an affirmance of the allowance would be little less than a practical confiscation of her right and estate, in order to save McCredie from the consequences of his own deliberate wrong and folly.

The observations of *Chancellor Kent*, which are too long for quotation, are worthy of attention in this connection.— *2 Com., 334 to 339.*

The circuit court decided, and we concur in that decision, that McCredie was not a *bona fide* purchaser, not an innocent or misled buyer, but a wrong-doer, seeking by means of back-door dealings with a third person, first to get an apparent title to an estate which honestly belonged to Mrs. Buxton, and which he knew she claimed, and then, on the basis of an apparent title so procured, to obtain from a court of equity a decree to complete his scheme and despoil her of her estate.

He well knew she claimed to be entitled to the entire interest. He well knew she did not abandon her right to him, or acquiesce in his pretensions. He nevertheless went on, heedless of her claim and of her equities, and heedless of all consequences, and made expenditures wholly unsuitable to her needs or ability or to the place in her hands.

The equity for compensation could not, then, arise on the ground that McCredie had purchased in good faith, because he had not; nor on the ground that he was defend-

ing in equity on the footing of some honest claim or interest against an aggressor, because he himself was the aggressing party in the transaction and in the litigation, and was in the wrong throughout. It could not arise on any ground of acquiescence by Mrs. Buxton in his making expenditures, because she did not, as he knew, acquiesce in his claim; and his expenditures could not have been made, and were not made, on the faith of any submission by her.— *Fonb., B. 1, ch. 1, § 3, n. y.; Story Eq. J., § 64, E.; Pilling v. Armitage, 12 Ves., 78; Patterson v. Brown, 32 N. Y., 81.*

Finally, it would seem reasonable, when one party attempts to cheat another out of his estate by dealings behind his back with a third, and so far succeeds as to get a colorable title, and then, upon the assumption that his inequitable conduct has gained him a position which assures success, he proceeds, in his own wrong and without misleading conduct by the innocent party, to expend money on the estate according to his own notions and irrespective of the utility of the mode of expenditures to the true owner, and then further and at last comes into equity to enforce his pretensions and get a ratification of his doings and title, that the court should tell him that it will not aid him, on the one hand, by directly giving him the estate, or on the other, by obliging the innocent object of his inequitable proceedings to pay him, at the peril of yielding her estate to him, any indemnity for his wanton expenditures.

But in saying this the court would not lose sight of its guiding doctrines, and would aim at practical results in harmony with them. It will keep in mind that it is naturally just that one shall not be enriched by the detriment and injury of another.

Now, the true principle on which the court ought to proceed, is, to protect in all its integrity the equity of the unoffending party, and not to impose *penalties* on the *offending* one; and the latter should be subjected to no greater losses than are fairly and practically incident to the

due protection and relief of the *former;* and such losses as the last must in truth be taken as self-inflicted by the wrong-doer.

Considering the real state of facts disclosed by the record, in the light of this obvious dictate of equity, no reason is perceived why, consistently with full equitable redress to Mrs. Buxton, McCredie may not be allowed, within some short time, to remove the barn, doing no unnecessary hurt, and restoring the site to as good condition as it was before the erection. As a practical matter, the other works cannot be shifted, and in regard to them, McCredie must be considered as having immovably annexed them in his own *wrong;* and in view of all the circumstances it seems hardly expedient to go into the question of the use of the property.

Mrs. Buxton ought to recover her costs of both courts upon the bill filed by McCredie, so far as they may be distinguished from costs incurred in the second bill, and in regard to the latter, neither party should recover costs against the other. A decree being made in conformity with this opinion, the cause should be remanded for such further proceedings as shall be found necessary.

CAMPBELL, and COOLEY, JJ., concurred.

CHRISTIANCY, J., did not sit in this case.